[Nos. 42570, 42571.     En Banc.     May 10, 1973.]

STUART WEISS et al., Petitioners, v. LOUIS J. BRUNO, as Superintendent of Public Instruction, et al., Respondents.

STUART WEISS et al., Petitioners, v. ROBERT S. O'BRIEN, as Treasurer of State, et al., Respondents.

200

*Montgomery, Purdue, Blankinship & Austin,* by *John D. Blankinship* and *Jerry W. Spoonemore,* for petitioners.

*Slade Gorton, Attorney General,* and *Malachy R. Murphy, Assistant, Schweppe, Doolittle, Krug, Tausend, Beezer & Beierle,* by *Alfred L. Schweppe, Preston, Thorgrimson, Ellis, Holman & Fletcher,* by *Gerald Grinstein* and *Robert L. Gunter, Michael J. Fox, Moriarty, Long, Mikkelborg & Broz,* and *Richard F. Broz,* for respondents.

*Roberts, Shefelman, Lawrence, Gay & Moch, George M. Mack, William G. Tonkin,* and *Albert M. Franco,* amici curiae.

BRACHTENBACH, J.—These consolidated cases challenge the constitutionality of two separate legislative enactments and seek to prohibit disbursement of public funds for tuition of students at nonpublic schools in the state of Washington. The first case involves financial assistance in grades 1 through 12 for needy and disadvantaged students, attending public and private schools. The second is directed against the law providing a tuition supplement program to students attending independent or private institutions of higher education.

After the petitions for a writ of prohibition were filed with this court, the cases were consolidated and referred to the Thurston County Superior Court for determination of the facts. Petitioners in both cases ask this court to declare unconstitutional the statutes and administrative acts which purport to establish the two programs and to prohibit the state officers involved from disbursing funds under these programs.

Broadly stated, the major issue in each case is whether or not public funds may be disbursed pursuant to the challenged legislation without violating either article 9, section 4 of the Washington State Constitution or the establishment clause of the first amendment to the United States Constitution. We hold that they may not.

While these cases have been consolidated and do involve similar problems, the matters are sufficiently distinct to warrant separate treatment.

*Weiss v. Bruno (No. 42570)*:
*The Grades 1-12 Program*

The supplemental budget, Laws of 1972, 1st Ex. Sess., ch. 155, § 10, pp. 494, 497, contained the genesis of the grades 1-12 controversy. That bill provided:

That $200,000 shall be used by the Superintendent of Public Instruction for individual grants to needy and disadvantaged elementary and secondary pupils attending public and private schools approved by the state board of education *who demonstrate a financial inability to meet the total cost of supplies, books, tuition, incidental and other fees* for any school term *or who,* because of adverse cultural, educational, environmental or other circumstances, *are deemed as being highly improbable of continuing in the schools in which such pupils are enrolled* and that such financial assistance, after other scholarships, grants, and assistance are deducted, shall not exceed three hundred dollars per secondary pupil (grades 9-12) and one hundred dollars per elementary pupil (grades 1-8)

(Italics ours.)

Pursuant to this enactment, the superintendent adopted a plan for administering the grant program and paying out

85 percent of the grant funds in the 1972-73 regular school year and 15 percent in the 1973 summer session. Under the plan, students attending any accredited public, private or parochial school were eligible to receive grant funds so long as they were found to be either "needy" in terms of their inability to pay the cost of tuition, books, supplies and fees charged by such schools or "disadvantaged" in terms of their inability to remain in such schools without financial assistance from the state.

A copy of the plan ("Guidelines") and application forms were mailed to all appropriate officers of public, private and parochial schools throughout the state. In applying for a grant, the pupil was required to identify the school at which he intended to spend the money, and the school was required to tell the superintendent how much it charged for tuition, books, supplies and fees.

Under the written "check-in procedure," all applications were segregated by the superintendent as between public school pupils and private or parochial pupils. Only those applications received from private and parochial schools were evaluated for the 1972-73 regular school term. Since, as a matter of administrative determination, no public student application was considered for the regular school term, 85 percent of the grant funds were automatically allocated to private and parochial students. Applications from public schools were to be evaluated solely for the 1973 summer session. While this determination was not mandated by the statute, it was a logical construction thereof since public schools do not collect tuition during the regular school term, but do for summer session.

The superintendent proposed to disburse the grants by checks made payable to each named student. Checks for all of the students at a particular school would be sent to the student in care of the school to insure that the funds would be applied for their intended purpose. The award procedures in the guidelines do not explain how, for example, a 6-year-old student would endorse a state warrant, payable to the student, and thereby assign his grant to the school.

The guidelines do clearly require, however, that the grant money actually be spent by the school for school purposes. The money could not be used by a public school student to help support his family, but must go for actual school expenses.

The superintendent proposed to conduct an audit to make sure that the funds were applied to the student's tuition, books and other expenses, but the actual technique for doing so had not been developed. There are no restrictions —in either the enabling legislation or the guidelines—upon the actual and ultimate use of the grant funds applied by the individual school to the student's tuition.

For the 1972-73 regular school term, approximately 93 percent of the total grants awarded (representing approximately 91 percent of the funds to be disbursed) were awarded to students of schools affiliated with the Roman Catholic Church. Only 2.8 percent of the funds were awarded to students attending nondenominational or unaffiliated private schools.

The individual petitioners are all citizens, residents and taxpayers of the state of Washington. Respondents include the State Superintendent of Public Instruction and the State Treasurer. Intervenors include certain low income parents whose children, attending Catholic schools, were scheduled to receive financial aid. Also intervening is the Washington Federation of Independent Schools, a nonprofit corporation composed of nonpublic elementary and secondary schools in this state.

Before turning to the legal issues herein, we acknowledge the great contribution of nonpublic schools to the educational goals of our citizenry. In the Spokane Diocese alone approximately 7,000 students are being educated in the Catholic schools. While there are no specific findings as to the total number of students in private schools throughout the state, it is common knowledge that the number is large. Obviously, some of the parents of students not attending public schools pay both taxes to support public schools and tuition to support nonpublic schools.

However, the question before us is not whether the sectarian schools of this state perform a valuable educational function, but whether these monetary grants violate the constitutions. Petitioners contend that this program violates the establishment clause of the first amendment to the United States Constitution, which provides that "Congress shall make no law respecting an establishment of religion," as made applicable to the states by the Fourteenth Amendment. Further, petitioners allege that the statute and administrative plan violate article 9, section 4 and article 1, section 11[1] of the Washington State Constitution. Standing alone, article 9, section 4 is determinative in this case.

Neither recognition of the accomplishments of these schools nor appreciation of the laudable purpose of the statute can overcome the clear constitutional provisions which the members of this court have sworn to uphold. It is inescapable that we must hold that both the statute and the administrative plan violate Const. art. 9, § 4, the language of which is crystal clear:

> All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence.

It would serve no useful purpose for this court to engage here in a philosophical discussion of the reasons for, or wisdom of, this constitutional concept of separation of church and state. It is tempting to inject justification for our result with a lengthy recital of the long history of conflict between sects, to chronicle the historical debate and division engendered by religious differences, and to even note the religious strife which today is still causing death and destruction in other parts of the world.

Instead it is our constitutional duty under article 9, section 4 to ascertain first whether this legislation supports the subject schools, even in part, with public funds and

---

[1]Const. art. 1, § 11, provides in part that: "No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment . . . ."

second, if so, whether these schools are free from sectarian control and influence.

In deciding these questions we recognize that the proscription of article 9, section 4 is far stricter than the more generalized prohibition of the first amendment to the United States Constitution. While the establishment clause broadly condemns any law "respecting an establishment of religion," our constitution specifically demands that no public funds be used to maintain or support any school which is under sectarian control or influence. There is no such thing as a "de minimis" violation of article 9, section 4. Nor is a violation of this provision determined by means of a balancing process. The words of article 9, section 4 mean precisely what they say; the prohibition is absolute.[2]

It is indisputable that this more restrictive clause was the deliberate design of the framers of our constitution. The statehood compact with the United States required that provision be made for a public school system free from sectarian *control*. Const. art. 26, § 4. Obviously not satisfied with the broader concept of control, the authors of our constitution added the words "or influence." A motion to strike those words failed. *Journal of Washington State Constitutional Convention,* at 689.

We turn then to the first inquiry under Const. art. 9, § 4: does the challenged program support the schools in question with any public funds? Respondents argue that only the recipient student benefits from the grant, and that the student's school receives no benefit. But students are the lifeblood of a private school. As will be discussed in detail in connection with the First Amendment issue, *infra,* a direct

---

[2]The only possible qualification upon the sweeping prohibition of Const. art. 9, § 4 would result from conflict with the free exercise clause of the first amendment to the United States Constitution. No question is raised here of infringement of any person's right to the free exercise of his faith. The question is not whether a student may attend a religious school, but whether the state may subsidize that attendance. No element of coercion has been suggested by respondents, and the free exercise clause is not involved in these cases. *Tilton v. Richardson,* 403 U.S. 672, 29 L. Ed. 2d 790, 91 S. Ct. 2091 (1971); *School Dist. v. Schempp,* 374 U.S. 203, 10 L. Ed. 2d 844, 83 S. Ct. 1560 (1963).

financial grant which enables a needy student to pay tuition and thereby remain in a private school obviously supports the school.

However, the question of whether the principal or primary effect of this program is to benefit the student or the school is not controlling for purposes of determining the existence of unconstitutional support under article 9, section 4. In interpreting this provision we long ago rejected the theory that "indirect" or "incidental" state support of a sectarian school is permissible.

In *Mitchell v. Consolidated School Dist. 201*, 17 Wn.2d 61, 135 P.2d 79, 146 A.L.R. 612 (1943), we declared unconstitutional an act providing for free transportation for schoolchildren attending private or parochial schools in all cases where transportation was provided for children attending public schools. The legislature enacted the statute in a purported exercise of the police power in order to reduce accidents and traffic hazards to which all children are exposed in attending schools under the compulsory education laws of the state. Thus, the statute purported to treat *all* students equally. We held that the statute clearly violated article 9, section 4, and article 1, section 11, "unless it may be said that the transportation of pupils to and from the . . . school is of *no* benefit to the school itself." (Italics ours.) *Mitchell v. Consolidated School Dist. 201, supra* at 66. The court then rejected the argument that the transportation benefited the pupils and their parents only:

> We think the conclusion is inescapable that free transportation of pupils serves to aid and build up the school itself. That pupils and parents may also derive benefit from it, is beside the question.

*Mitchell v. Consolidated School Dist. 201, supra* at 68.

Interpreting the establishment clause of the First Amendment, the United States Supreme Court reached a contrary decision in *Everson v. Board of Educ.*, 330 U.S. 1, 91 L. Ed. 711, 67 S. Ct. 504, 168 A.L.R. 1392 (1947). In a 5-4 decision, the court upheld a New Jersey statute which authorized reimbursement to parents of both public and non-

public students for money expended for bus transportation on public transportation systems. Acknowledging that the legislation went to the verge of the state's constitutional power, the majority concluded:

> The State contributes no money to the schools. It does not support them. Its legislation, as applied, does no more than provide a general program to help parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools.

*Everson v. Board of Educ., supra* at 18.

There are numerous distinctions between the nonideological bus transportation provided to all students in *Everson* and the unrestricted money grants awarded to cover the costs of tuition in this case. But while these distinctions are relevant to our review of the challenged program under the First Amendment, they are not determinative under our state constitution.

In *Visser v. Nooksack Valley School Dist. 506*, 33 Wn.2d 699, 207 P.2d 198 (1949), this court explicitly refused to follow *Everson* and held that a statute authorizing the use of public school busses by all children attending schools in accordance with compulsory attendance laws violated article 1, section 11 and article 9, section 4. Again the court rejected the theory that transportation benefits only the student, and not the school. We held that free school bus transportation constitutes support and maintenance of the schools in question, in the form of a "direct, substantial, and continuing public subsidy to the schools, *as such,* thus encouraging their construction and maintenance, and enhancing their attendance, at public expense." *Visser v. Nooksack Valley School Dist. 506, supra* at 708. Thus, the scope of inquiry here is limited to whether the schools in question are maintained or supported by these grants; whether other parties are also benefited is immaterial.

Even more than in the case of bus transportation, the private schools in the instant case would be "maintained or supported" by the unrestricted money grants provided for by this program. We proceed, therefore, to the second in-

quiry under article 9, section 4—*i.e.*, are these schools under "sectarian control or influence?"

■ The findings relate to the Catholic schools of the Spokane Diocese as being representative of the Catholic schools in the state (to which 91 percent of the grant funds for the 1972-73 regular school term were awarded). The school buildings are owned by the Catholic Bishop of Spokane. In the typical parish school, approximately 70 percent of operating income comes from parish funds. The parish pastor exercises some general supervision over management of the schools. Presently all principals are religious rather than lay persons; approximately half of the teaching staff is composed of religious persons.

While a full curriculum of secular subjects is taught, a course in religion is taught in all grades 1 through 12. Such classes include instruction in the sacraments of the Catholic Church. Even classes in which secular subjects are taught often begin with a prayer, although no diocese policy requires it. Most school buildings contain religious symbols, and some religious teachers wear clerical garb in school.

We must hold that such schools are under sectarian influence. Indeed, it was found that one reason why parents elect to send their children to these schools is the religious instruction. These schools and the parents of the children are to be commended for their devotion to and support of their faith, but article 9, section 4 of our constitution prohibits the use of public funds for their support in any manner.

Appreciating the significance of this decision, we shall answer the remaining contentions of respondents, none of which remove this program from the ambit of article 9, section 4.

■ First, respondents contend that the legislation here was intended and passed as general welfare legislation, a legitimate exercise of the state's police power. This argument was made, and rejected, in both *Mitchell v. Consolidated School Dist. 201* and *Visser v. Nooksack Valley School Dist. 506, supra*. The court noted in *Mitchell* that

an otherwise legitimate exercise of the police power must fall if the statute violates article 9, section 4 or article 1, section 11: "the police power—broad and comprehensive as it is—may not be exercised in contravention of plain and unambiguous constitutional inhibitions." *Mitchell v. Consolidated School Dist. 201, supra* at 64. When the legislature enacted similar legislation in 1945, it declared that the statute providing for public transportation for all schoolchildren was passed in response to an *emergency*. Yet the court quoted with approval the above language from *Mitchell. Visser v. Nooksack School Dist. 506, supra* at 705. The legislature cannot violate specific constitutional requirements simply by declaring the statute in question to be within the scope of the police power. "Otherwise, the result would be a police state, and the legislative branch of the government would be omnipotent." *Peterson v. Hagan,* 56 Wn.2d 48, 53, 351 P.2d 127 (1960).

Next, respondents rely on the principle that the support of the needy is a recognized governmental function, citing *Morgan v. Department of Social Security,* 14 Wn.2d 156, 127 P.2d 686 (1942). However, while this point may avoid the prohibition of article 8, section 5 of the state constitution,[3] it does not follow that such aid can be given to students of sectarian schools in contravention of article 9, section 4. The fact that the grants herein are limited to "needy" students does not remove the program from the purview of article 9, section 4; rather, the scope of the class of recipients eligible for unconstitutional grants is merely narrowed.

Likewise, the contention that this legislation applies generally to all students alike is not in point. The legislation in *Visser v. Nooksack Valley School Dist. 506, supra,* applied to all schoolchildren, but was held unconstitutional. State aid to sectarian schools in violation of article 9, section 4 is not elevated to a permissible status through its combination

---

[3]Const. art. 8, § 5 provides that:

"The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation."

in a statute with grants to public schools that are otherwise constitutional. Even if public schools *did* charge tuition for the regular school term (which they do not), and were therefore eligible under this program, similar tuition grants to schools under sectarian influence still would be prohibited. Nor is a violation of article 9, section 4 determined by the percentage of the grants which are awarded to sectarian schools. The use of *any* public funds for such a purpose is proscribed. Thus, even if we accepted the contention that the decision to limit grants for the regular school year to nonpublic schools is not mandated by the statute, but was merely a determination incorporated in the administrative plan, our result would be the same. The statute specifically calls for grants to pupils of private schools, the vast majority of which we have found to be under sectarian influence. The statute and the plan must fall.

So that our construction of article 9, section 4 will be unmistakable, we reiterate that the program herein is not unconstitutional merely because the use of the money by the recipient schools is unrestricted; nor is it so simply because nonpublic schools would receive the greater portion of funds under the statute and plan. While such factors may be relevant to a determination of the program's validity under the first amendment to the United States Constitution, they are immaterial to our inquiry under article 9, section 4. Any use of public funds that benefits schools under sectarian control or influence—regardless of whether that benefit is characterized as "indirect" or "incidental"— violates this provision. And this is so irrespective of whether the challenged program also benefits other parties in addition to the schools.

■ Finally, respondents urge that this program simply fulfills "the paramount duty of the state to make ample provision for the education of all children residing within its borders" set forth in Const. art. 9, § 1. Certainly that broad constitutional mandate must be carried out in a manner consistent with the rest of the constitution and must, therefore, yield to the specific restriction of Const. art. 9, § 4.

Read together, these sections simply mean that the state, in carrying out its paramount duty of education, may not support schools under sectarian control or influence.

■ We hold that the above quoted provision of Laws of 1972, 1st Ex. Sess., ch. 155, § 10, p. 494, and the administrative plan adopted pursuant thereto, are in violation of Const. art. 9, § 4.

Indeed, the challenged statute and plan fail to satisfy the less restrictive requirements of the establishment clause of the first amendment to the United States Constitution.

Under the establishment clause, our starting point for analysis is *Everson v. Board of Educ., supra,* in which the court upheld a statute authorizing reimbursement to parents of public and parochial schools of money expended by them for the bus transportation of their children to school on the public transportation system. While noting that the state could not "consistently with the 'establishment of religion' clause of the First Amendment contribute tax-raised funds to the support of an institution which teaches the tenets and faith of any church" (*Everson v. Board of Educ.,* 330 U.S. 1, 16, 91 L. Ed. 711, 67 S. Ct. 504, 168 A.L.R. 1392 (1947)), the court distinguished bus transportation as a general program applying to all students alike, regardless of their faith. The court compared the nature of the aid given —bus transportation—to other nonideological general government services "indisputably marked off from the religious function" of the parochial school. *Everson,* 330 U.S. at 18. Thus, although the school might receive some incidental benefit, bus transportation was found to be no more unconstitutional than police and fire protection or public highways, which also indirectly aid the school.

The court later relied upon *Everson* in sustaining a New York statute requiring local public school authorities to lend textbooks free of charge to all students in grades 7 through 12, regardless of the schools attended. *Board of Educ. v. Allen,* 392 U.S. 236, 20 L. Ed. 2d 1060, 88 S. Ct. 1923 (1968). The court noted that only textbooks approved by

public school authorities could be loaned pursuant to the law, and such books had to be secular in nature. Moreover, all students were eligible under the statute, and the books were being loaned to the students:

> [N]o funds or books are furnished to parochial schools, and the financial benefit is to parents and children, not to schools. Perhaps free books make it more likely that some children choose to attend a sectarian school, but that was true of the state-paid bus fares in *Everson* and does not alone demonstrate an unconstitutional degree of support for a religious institution.

(Footnote omitted.) *Board of Educ. v. Allen, supra* at 243-44.

The court recognized that religious schools pursue two goals, religious instruction and secular education; the meager record failed to show that the book loan program assisted the religious educational function of the parochial schools. Thus the court found the legislation to have " ' a secular legislative purpose and a primary effect that neither advances nor inhibits religion.' " *Board of Educ. v. Allen, supra* at 243.

In upholding a New York constitutional provision and statute granting property tax exemptions to religious organizations for religious properties used solely for religious worship, the court articulated an additional test in *Walz v. Tax Comm'n,* 397 U.S. 664, 25 L. Ed. 2d 697, 90 S. Ct. 1409 (1970). Observing that the challenged statute granted exemption to religious organizations within a broad class of religious, educational and charitable properties, the court found the legislative *purpose* of the exemption to be neither the advancement nor inhibition of religion. The court then proceeded to inquire whether the *effect* of the tax exemption would be "an excessive government entanglement with religion." *Walz v. Tax Comm'n, supra* at 674. In applying this test to the property tax exemption, the court delineated the relevant criteria to be considered:

> [T]he questions are whether the involvement is excessive, and whether it is a continuing one calling for official

and continuing surveillance leading to an impermissible degree of entanglement. Obviously a direct money subsidy would be a relationship pregnant with involvement and, as with most governmental grant programs, could encompass sustained and detailed administrative relationships for enforcement of statutory or administrative standards . . .

*Walz v. Tax Comm'n, supra* at 675.

Noting the unbroken historical practice by the states of according the exemption to churches, and recognizing that elimination of the exemption would actually expand the involvement of government through tax valuation of church property, tax liens and foreclosures, the court found the entanglement resulting from the tax exemption to be not excessive.

The Supreme Court synthesized these various criteria for reviewing state aid to religious institutions in *Lemon v. Kurtzman*, 403 U.S. 602, 29 L. Ed. 2d 745, 91 S. Ct. 2105 (1971), as it considered two consolidated appeals. The first involved a Rhode Island act authorizing state officials to supplement the salaries of teachers of secular subjects in nonpublic elementary schools at which the average per-pupil expenditure on secular education was less than the average in the public schools. The supplement was to be paid directly to the teacher. Records were to be audited by the state to determine how much of the expenditure was attributable to secular education and how much to religious activity. To be eligible, teachers were required to teach only subjects offered in the public schools, to use only teaching materials used in the public schools and to agree not to teach a course in religion while receiving any salary supplement.

A Pennsylvania statute, passed in response to a crisis the legislature found to exist in the state's nonpublic schools due to rapidly rising costs, was the subject of the second appeal. The legislation authorized the superintendent of public instruction to "purchase" specified secular educational services from nonpublic schools. Under the statute,

the state would directly reimburse the school for its actual expenditures for teachers' salaries, textbooks, and instructional materials. A school seeking reimbursement was required to account for the separate cost of secular education; this accounting was subject to state audit. Reimbursement was limited to certain secular courses presented in the curricula of the public schools. Textbooks were to be approved by the state. Finally, reimbursement was prohibited for any course containing " 'any subject matter expressing religious teaching, or the morals or forms of worship of any sect.' " *Lemon v. Kurtzman, supra* at 610.

■ Bringing together the different standards applied in prior cases, the court distilled these "cumulative criteria" into a 3-part establishment clause test:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, *Board of Education v. Allen,* 392 U.S. 236, 243 (1968); finally, the statute must not foster "an excessive government entanglement with religion." *Walz, supra,* at 674.

*Lemon v. Kurtzman, supra* at 612-13. To withstand attack under the establishment clause, challenged state action must satisfy each of the three criteria.

Resting solely on the ground of excessive entanglement, the court held both statutes to be violative of the religion clauses of the First Amendment. Three areas of entanglement were found. First, recognizing that a state must be certain that subsidized teachers do not inculcate religion, the court declared that:

> A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed and the First Amendment otherwise respected. Unlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment. These prophylactic contacts will involve excessive and enduring entanglement between state and church.

*Lemon v. Kurtzman, supra* at 619.

The need for the state to examine school records to ascertain how much of the school's total expenditures was attributable to secular education and how much to religious activity presented a second source of entanglement:

> This kind of state inspection and evaluation of the religious content of a religious organization is fraught with the sort of entanglement that the Constitution forbids.

*Lemon v. Kurtzman, supra* at 620.

Finally, a broader base of entanglement, presented by the divisive political potential of the programs, was described:

> Partisans of parochial schools, understandably concerned with rising costs and sincerely dedicated to both the religious and secular educational missions of their schools, will inevitably champion this cause and promote political action to achieve their goals. Those who oppose state aid, whether for constitutional, religious, or fiscal reasons, will inevitably respond and employ all of the usual political campaign techniques to prevail. Candidates will be forced to declare and voters to choose. It would be unrealistic to ignore the fact that many people confronted with issues of this kind will find their votes aligned with their faith.
> . . . The potential divisiveness of such conflict is a threat to the normal political process.

*Lemon v. Kurtzman, supra* at 622.

Applying the criteria set forth in *Lemon*, the United States District Court in *Wolman v. Essex*, 342 F. Supp. 399 (S.D. Ohio 1972), *aff'd mem.*, 409 U.S. 808, 34 L. Ed. 2d 69, 93 S. Ct. 61 (1972), struck down an attempted aid program similar to the one challenged herein. The Ohio statute provided reimbursement to parents of nonpublic schoolchildren "for a portion of the financial burden experienced by them in providing to their children at reduced cost to taxpayers, educational opportunities equivalent to those available to public school pupils . . . ." *Wolman v. Essex, supra* at 402. Parents became eligible for reimbursement under the program solely and specifically by paying tuition to nonpublic schools; no restrictions were placed upon the schools' use of the tuition.

The court specifically rejected the argument that the law achieved validity because the parent who enrolls his child at a church-affiliated school saves the general taxpayer money and thus performs a public service:

> If individuals, for reasons of personal religious belief, voluntarily undergo a financial handicap, foregoing available public facilities by sending their children to selected schools, the First Amendment stands as a bar to their being reimbursed by the state for their sacrifice. This principle is no less vital if, as a result of such sacrifices, the state achieves cultural diversity or derives economic benefit.

*Wolman v. Essex, supra* at 419.

The court concluded that the grant statute fostered an excessive entanglement with religion by transferring public funds to religiously oriented private schools, thus violating the establishment clause.

Weaving the facts of the instant case into this fabric of establishment clause decisions, we conclude that the first aspect of the *Lemon* test is satisfied; *i.e.*, there is a valid secular legislative purpose in aiding needy and disadvantaged children. However, moving to the second *Lemon* requirement, we hold that the principal or primary effect of the statute and plan advances religion, and thus violates the First Amendment.

The aid in this program is a money subsidy. Obviously, the lion's share of the grant funds here will be applied to tuition, and as the court in *Wolman v. Essex, supra,* stated at page 414:

> It cannot be argued that money paid as tuition to a parochial school is neutral, non-ideological or "atmospherically indifferent on the score of religion." . . . Tuition forms the major part of a school's general fund and moneys derived from it can be used for any purpose it deems legitimate. Such funds may be used for the construction of a chapel as well as a gymnasium; for the purchase of religious icons as well as laboratory test tubes. . . .
>
> . . . Whereas bus rides are inherently secular . . . and textbooks are arguably so . . . paro-

chial school teachers are not . . . Tuition is even less so.

Moreover, the state has made no attempt here to insure that the funds provided are used by the school for secular purposes that might be permissible under the First Amendment. There are no restrictions—in either the enabling legislation or the guidelines—upon the actual and ultimate use of the money by the school. Furthermore, there is no provision in the program for any follow-up check to guarantee that funds granted to denominational schools are used for secular purposes. Thus, under the program a sectarian institution is free to use this money for the essentially religious activities of the school. This is in sharp contrast to the nonideological public bus transportation permitted in *Everson*, a type of aid that could not *itself* be used to promote the religious function of the school.

The state cannot simply assume that the money will be used for secular purposes—it must be certain. *See Lemon v. Kurtzman*, 403 U.S. 602, 619, 29 L. Ed. 2d 745, 91 S. Ct. 2105 (1971). Standing alone, the unrestricted monetary nature of these grants casts grave doubt as to the constitutionality of this program.

This doubt is reinforced by an examination of the class to be affected by the program. No public school application was considered for the regular school term. Approximately 93 percent of the grants awarded went to schools affiliated with the Roman Catholic Church. As the court stated in *Wolman v. Essex, supra* at 412:

> The limited nature of the class affected by the legislation, and the fact that one religious group so predominates within the class, makes suspect the constitutional validity of the statute.

Even if the public student applications were considered for the regular school term, nonpublic schools would still receive the bulk of the funds. This is necessarily so, because public schools do not charge tuition. Thus, students attending private institutions—where tuition is the major cost of attendance—would naturally demonstrate a greater

financial "need" than public students, and would receive more funds. The administrative decision to consider only private grants for the regular school year simply recognizes the reality of the situation. We conclude, as did the court in *Wolman*, that "[a] substantial beneficiary of the statute can only be organized religion." *Wolman v. Essex, supra* at 413.

Respondents suggest, however, that the grants are to be awarded to students, and therefore the schools are not benefited. The grants were to be payable to each named student, but all state warrants for students at a particular school were to be sent to the students in care of the school to insure that the funds would be applied for their intended purpose. The Superintendent of Public Instruction planned to conduct audits to make sure that the funds were actually applied to the student's tuition, books and other expenses. At best this is a thinly veiled grant directly to the school. Actually, it creates great doubt as to the legality of a 6-year-old first grade child applying for, receiving and negotiating a state warrant.

It is incorrect to characterize the nature of these monetary grants as "incidental" benefits to the schools. Although the grant is nominally awarded to the student, the ultimate effect of this program is to transfer unrestricted public funds directly to the church-affiliated school. The only colorably "indirect" aspect of this program is the operation of the funding mechanism, but this alone will not save the statute:

> Payment to the parent for transmittal to the denominational school does not have a cleansing effect and somehow cause the funds to lose their identity as public funds. While the ingenuity of man is apparently limitless, the Court has held with unvarying regularity that one may not do by indirection what is forbidden directly; one may not by form alone contradict the substance of a transaction.

*Wolman v. Essex*, 342 F. Supp. 399, 415 (S.D. Ohio 1972).

The court in *Wolman* held it to be of no constitutional significance that the state aid would go indirectly to de-

nominational schools through the medium of parental grants. Likewise, the recipient students here simply serve as conduits for the flow of public funds to the schools, and we attach no constitutional significance to the fact that the money travels "indirectly" through the medium of student grants.

We hold that the statute and plan do not satisfy the second requirement of *Lemon v. Kurtzman, supra;* their principal or primary effect advances religion.

■ Finally, the program fosters an excessive government entanglement with religion, thus contravening the third criterion of *Lemon.* The Superintendent of Public Instruction proposed audits to insure that funds are applied to the intended purposes. But just as government is constitutionally entitled to freedom from religious interference, so are religious schools guaranteed freedom from governmental intrusion. Seemingly the intrusion is minimal here, but in fact it may be substantial. Inherent in the audit process will be a determination of what is tuition, and what fees and charges are proper costs to which the grant funds may be applied. If a school had a separate cost allocated to a religious project, the value judgment of a state official would be imposed in determining the validity of the application of public funds to such charge. As the court recognized in *Lemon v. Kurtzman, supra* at 621:

> The history of government grants of a continuing cash subsidy indicates that such programs have almost always been accompanied by varying measures of control and surveillance. The government cash grants before us now provide no basis for predicting that comprehensive measures of surveillance and controls will not follow.

In addition, the same broad political entanglement found in *Lemon* and *Wolman* is inherent in this program. Candidates for the legislature would be forced to state their position as to the desirability and extent of aid to nonpublic schools; voters would be forced to consider this factor in casting their votes. As Justice Harlan pointed out in *Walz v. Tax Comm'n, supra,* where, as here, the state aid is in

the form of a direct money subsidy, the risks of political entanglement are intensified:

Subsidies, unlike exemptions, must be passed on periodically and thus invite more political controversy than exemptions. Moreover, subsidies or direct aid, as a general rule, are granted on the basis of enumerated and more complicated qualifications and frequently involve the state in administration to a higher degree . . .

*Walz v. Tax Comm'n*, 397 U.S. 664, 699, 25 L. Ed. 2d 697, 90 S. Ct. 1409 (1970) (separate opinion of Harlan, J.); *cf. Walz*, at 690 (Brennan, J., concurring).

That the $200,000 allocated by the statute is a relatively small portion of the state's total expenditures is not significant for constitutional purposes, for this "constitutional policy does not turn on the amount of aid a statute provides in any particular school year." *Wolman*, at 418. Certainly this statute represents the beginning—and not the end—of such aid:

Here we are confronted with successive and very likely permanent annual appropriations that benefit relatively few religious groups. Political fragmentation and divisiveness on religious lines are thus likely to be intensified.

The potential for political divisiveness related to religious belief and practice is aggravated in these two statutory programs by the need for continuing annual appropriations and the likelihood of larger and larger demands as costs and populations grow. . . .

. . .

. . . [M]odern governmental programs have self-perpetuating and self-expanding propensities. These internal pressures are only enhanced when the schemes involve institutions whose legitimate needs are growing and whose interests have substantial political support. Nor can we fail to see that in constitutional adjudication some steps, which when taken were thought to approach "the verge," have become the platform for yet further steps. A certain momentum develops in constitutional theory and it can be a "downhill thrust" easily set in motion but difficult to retard or stop.

*Lemon v. Kurtzman*, 403 U.S. 602, 623-24, 29 L. Ed. 2d 745, 91 S. Ct. 2105 (1971).

The substance of both the statute and plan here is to transfer public funds to schools having a substantial religious purpose and denominational character. We are obliged to conclude as the court did in *Wolman v. Essex*, 342 F. Supp. 399, 419 (S.D. Ohio 1972):

> However much we may approve, however much we may respect, however much we may admire the role of non-public education, we cannot substitute such approval, respect, and admiration for the plain language of the First Amendment of the United States Constitution.

### *Weiss v. O'Brien (No. 42571):*
### *The College Tuition Supplement Program*

The challenged legislation in Weiss v. O'Brien is chapter 56, Laws of 1971, 1st Ex. Sess., now codified as RCW 28B.10.830-.836, which directed the Council on Higher Education to "develop and administer a state plan to provide a tuition supplement program to undergraduate resident students attending an accredited independent or private institution of higher education within the state of Washington." RCW 28B.10.832. In accordance with that enactment the legislature appropriated $1,700,000 to fund the college tuition supplement program.

Section 1 of chapter 56 (RCW 28B.10.830) declares a legislative intent and purpose, in specific exercise of the police power, to recognize the contributions made to the educational level of this state by the independent and private institutions of higher education and to acknowledge that these general educational programs and services are in the public's interest. This declaration further bases the act upon the paramount duty of the state to make ample provision for the education of all children residing within its borders.

The council adopted a plan for the administration of the tuition supplement grant program. Under it, any resident student pursuing a minimum of 12 credit hours of instruction at any independent or private institution of higher

education is eligible to receive aid. An "independent or private institution of higher education" is defined as one accredited by the Northwest Association of Secondary and Higher Schools. Chapter 56 and the plan provide that no single grant may exceed $100, and no aid may be given to a student pursuing a degree in theology.

The council also prepared application cards and sent a supply of the cards to each private college or university. In applying for a grant, a student must obtain an application card from his school. No application was received directly by the state from a student, and if a student inquired of the council concerning the program he was referred to the private college or university. The application card, which must be signed by the student, contains the following provision: "I assign to the institution in which I am enrolled, the receipt of the tuition supplement grant with the amount of that grant being credited to my student tuition account."

Under the plan, on or before August 1st each eligible school submits to the council an estimate of the number of students who will participate in the program in the following academic year. Based upon these estimates the council then determines the amount of each grant and notifies the schools thereof. By November 1st, the schools submit to the council the application cards they have received from the students and lists of those students who are eligible.

The council then sends to each school a single state warrant representing all funds payable to the school with respect to its students eligible for aid. This single state warrant, payable to the school, is sent directly to the school, with a covering statement identifying the students at that institution for whom applications have been approved. The individual student never receives the money.

For the academic year 1971-72 the council disbursed $845,455 to 8,514 students at 10 colleges and universities under the plan. For the academic year 1972-73 the council received from these private schools estimates that 8,819

students in the state would qualify for the tuition supplement grant.

In contrast to the grades 1-12 program, aid is not limited in the college program to needy or disadvantaged students; also, the act in the college program is expressly limited to nonpublic students.

Petitioners in this suit are the same as in Weiss v. Bruno, No. 42570, and seek relief similar to that sought in the grades 1-12 case. Respondents here are the State Treasurer and the Council on Higher Education, a state agency. Intervenors include the Washington Friends of Higher Education, an association composed of or representing all of the private colleges and universities in the state of Washington, and certain students who attend those schools.

Focusing first on the question of whether the college program violates Const. art. 9, § 4, it is manifest from our discussion in Weiss v. Bruno that the ultimate result of both the act and the plan here is to support, in part, the schools in question with public funds. We thus proceed to the second relevant inquiry under Const. art. 9, § 4: are the recipient schools free from sectarian control and influence?

Most of the 255 pages of findings of fact are devoted to an analysis of the structure and operation of the 10 institutions. Typically, the following elements as to each institution are set forth: (1) history and current facts; (2) stated purposes; (3) governance; (4) faculty; (5) student body; (6) academic freedom; (7) property ownership, financial assistance and use of campus; (8) place of religion in the college, including physical surroundings, character and extent of religious activities; (9) college affiliation; (10) place of religion in curriculum; and (11) denominational control.

While we have reviewed all of these elements with regard to each institution, it would unnecessarily extend this opinion to set each forth. Instead, a representative cataloging will demonstrate adequately the nature of the 10 schools.

The stated purposes of these institutions are set forth in their articles of incorporation, their bylaws or their college

bulletins. Among these stated purposes we find the following: (1) ". . . To instruct and educate in harmony with the Christian faith as set forth in the Holy Scriptures . . . ."; (2) ". . . A Christian place, self-consciously Christian and Catholic because the teachings of our Lord are the inspiration for its being"; (3) ". . . We hope to instill a devotion to God which expresses itself in worship, in Christian conduct and in a sense of responsibility for extending the Kingdom of God."; (4) ". . . [The institution] expressly accepts the Catholic faith as the unique normative principal [sic] of authentic theology . . ."; (5) "It [the college] encourages academic excellence, in keeping with the great traditions of Christian scholarship, Christian ideals in teaching and administration, and an atmosphere conducive to the understanding of all beliefs."; (6) "To give a thorough knowledge of Bible truths and to develop evangelistic workers."

As for the manner of governance, the following elements are typical: (1) "Management and control of the college shall rest exclusively with the board of trustees, provided that at no time shall action be taken by such board contrary to the regulations, doctrines and standards of the Free Methodist Church of North America." (2) "A majority of the trustees shall belong to the Society of Jesus . . . ." (3) "A majority of the board of trustees shall be members of Christian churches." One institution requires at least two-thirds of the trustees to be members of a particular church with a minimum and maximum number who are to be ordained ministers of that church.

With regard to the choice of faculty, the findings range from no preference being given to members of a particular faith to the giving of such preference. One institution sets forth its philosophy of the fundamentals of the Christian faith and then states:

> The implementation of such a philosophy requires a Christian faculty who understands the nature and purpose of God as revealed in Jesus Christ and the nature and end of man as declared by the Scripture and attested

by human experience. The faculty must possess a thorough academic preparation combined with Christian devotion and commitment.

The bylaws of another provide:

Having been informed, prior to appointment, of the character of the university and its Christian mission, members of the faculty shall be expected to share the sacred trust of safeguarding the defined objectives of the university, upholding its honor and enforcing its rules and regulations. They shall set a worthy example of Christian life and seek to inculcate in the students the highest ideals of Christian man.

A review of the findings relating to the makeup of the student bodies indicates that generally a designation of the student applicant's religious preference is optional. One institution does specifically ask the applicant "what church do you attend" and whether or not he is a member. It also asks the student to "describe briefly in what ways the Christian faith has been of importance to you." Another requires a commitment for attendance at a Friday evening devotional service, as well as Sabbath school and church service on Sabbath morning.

All institutions appear to grant a high degree of academic freedom although one does provide, after recognition of respect for the religious beliefs and practices of all persons who cooperate in the operation of the university that:

The university requires only that all faculty members maintain a standard of life and conduct consistent with the philosophy and objectives of the institution. Intelligent analysis and discussion of Catholic dogma and official pronouncements of the Holy See on issues of faith and morals is encouraged. However, continued open espousal in the classroom or in assigned University activities of viewpoints which contradict explicit principles of Catholic faith or morals is opposed to the specified aims of this University.

It appears that uniformly the campus and buildings comprising the institutions are owned by separate corporate structures. Direct financial assistance from religious organi-

zations or churches is minimal, although one institution receives approximately 12 percent of its operating budget from its sponsoring church, but contributed services of the members of religious orders are substantially valuable in the Catholic oriented institutions.

There is a wide diversity in regard to the place of religion in the college. Some campuses exhibit religious symbols. Some classes begin with a prayer as a matter of practice, not policy. School holidays may include those of a nature peculiar to a particular faith. At one institution church attendance is mandatory. In another case students are expected to observe a day of worship, but there is no attempt to enforce attendance. The bylaws of one institution require all meetings of the trustees to be opened with a prayer. Catholic students at one university are required to make an annual retreat, some of which retreats have very little religious orientation. One university retains Jesuit priests and laymen specifically to foster and coordinate spiritual and religious life on campus.

While the findings disclose institutional affiliation with organizations ranging from the Association of Jesuit Colleges and Universities to the Association of Seventh Day Adventists Colleges and Secondary Schools, there is no finding of the significance of such affiliation in any instance.

Regarding religion in the curriculum, the findings are broad and nondefinitive. While many of the institutions require one or more courses in religion for a bachelor's degree, the findings conclude, in one instance, that such course is not distinctly Catholic. What it distinctly is, we are not told. In another instance the findings are that the institution offers undergraduate and graduate majors in three areas of religious concern: pre-ministerial, pre-mission, and pre-Christian education. One of those courses is set forth as seeking to equip a student to teach God's word effectively to all age groups.

Regarding the criterion of denominational control the

findings provide little help. For example, these findings, prepared by the parties, advise this court that as to one institution "the visibility of a church on campus is very low and the majority of the community view the college as a viable educational institution providing a high quality education." The meaning and significance of that conclusion is not apparent. In another instance, we have the conclusional statement of the president that the denominational requirements for the Board of Regents (including the requirements that a member of the board either be a member in good standing of a particular faith or a member in good standing of a church that acknowledges and confesses the ecumenical creeds of Christendom) have not led to attempts by the church to control the board. There is a finding that while a particular university is conducted under the auspices of a particular church, the relationship is spiritual and fraternal, but not legal or physical. (Whatever that means is not explained.)

In summary, varying degrees of religious orientation characterize each of the institutions before us. None exhibits all of the possible constitutionally fatal criteria, but none is free of all prohibited elements. Const. art. 9, § 4 does not provide that a minimal amount of sectarian control or influence is permissible. We cannot say that any of these schools is completely free from such influence.

The findings of fact demonstrate that, in differing degrees, all of these institutions were founded upon and continue to be dedicated to some element of sectarian purpose and influence. For this, their foresighted founders, their devoted supporters and their dedicated personnel are to be commended. Their efforts and principles should not be diluted by the temporary gain of money diverted from the public treasury, since an inevitable byproduct of this effort would be a weakening of such devotion and dedication. This is one of the very results sought to be avoided by the clear prohibition of article 9, section 4.

We conclude that chapter 56, Laws of 1971, 1st Ex. Sess.,

and the administrative plan adopted pursuant thereto violate article 9, section 4 of the Washington State Constitution, both on the face of the act and as applied to each of the recipient institutions herein.

In light of this determinative holding, we need not decide whether each of the 10 schools here has such a substantial religious purpose and character that state aid to each particular school would fall within the broader language of the establishment clause. However, as applied to those institutions whose religiosity is sufficient to place them within the ambit of the First Amendment, the act and plan would be unconstitutional under the federal constitution.

In those situations, this transfer of public funds to the narrow class of nonpublic schools (through the conduit of student grants) would violate the second *Lemon* requirement that the "principal or primary effect [of the statute] must be one that neither advances nor inhibits religion . . ." *Lemon v. Kurtzman,* 403 U.S. 602, 612, 29 L. Ed. 2d 745, 91 S. Ct. 2105 (1971). We note that here, as in the grades 1-12 program discussed above, there are no restrictions in either the enabling legislation or the administrative plan upon the use of the grant funds by the schools.

Such a holding would be consistent with *Tilton v. Richardson,* 403 U.S. 672, 29 L. Ed. 790, 91 S. Ct. 2091 (1971), decided by the Supreme Court on the same date as *Lemon.* In *Tilton,* the Supreme Court reviewed the Higher Education Facilities Act, which authorizes federal grants and loans to institutions of higher learning for the construction of academic facilities, but excludes " 'any facility used or to be used for sectarian instruction or as a place for religious worship, or . . . any facility which . . . is used or to be used primarily in connection with any part of the program of a school or department of divinity . . . .' " As long as these restrictions are obeyed, church-related schools are eligible for grants under the act. The United States Commissioner of Education requires such applicants to provide assurances that these restrictions will be respected. Prior to the *Tilton* decision, the United States

retained a 20-year interest in any facility constructed with these funds. If, during the period, the recipient violated the statutory conditions, the United States was entitled to recover an amount equal to the proportion of the facility's present value that the federal grant bore to its original cost. During the 20-year period, the statutory restrictions were enforced by the Office of Education by way of on-site inspections.

Upon a record which the court found to provide no basis for assuming that religiosity necessarily permeates the secular education of the four recipient colleges, the United States Supreme Court concluded that the act does not foster excessive entanglement between church and state. However, the court noted that under the act, a recipient institution's obligation not to use the facility for sectarian instruction or religious worship expired at the end of 20 years:

> Limiting the prohibition for religious use of the structure to 20 years obviously opens the facility to use for any purpose at the end of that period. It cannot be assumed that a substantial structure has no value after that period and hence the unrestricted use of a valuable property is in effect a contribution of some value to a religious body.

*Tilton v. Richardson, supra* at 683.

The court held the limitation of the restrictive use obligations to a period of 20 years to be in violation of the religion clauses of the First Amendment. It necessarily follows that the totally unrestricted money grants to the colleges herein constitute an advancement of religion in violation of the First Amendment.

As for the potential of excessive entanglement in the college tuition supplement program, administrative entanglement is unlikely. The application process is the only contact the council has with the individual institutions or students. The council makes no audit to insure that the funds will be used for nonreligious purposes, nor to see that the disbursement is actually applied to students' tuition.

However, political entanglement is intrinsic in this pro-

gram. Unlike the 1-time, single purpose construction grants permitted in *Tilton,* the unrestricted monetary grants in the instant case are likely to result in a continuing financial dependency by the recipient schools upon the state. Greater and greater appropriations are likely to be demanded as costs increase each year, thus splitting the candidates and the electorate along religious lines. As emphasized in Weiss v. Bruno, these grants can only serve to aggravate and expand—not to abate—this controversy.

In light of our holdings under Const. art. 9, § 4 in both of these cases, and under the first amendment to the United States Constitution as to the grades 1-12 program, it is unnecessary to reach the additional challenges made by petitioners to these statutes and administrative acts. One further matter deserves discussion, however.

■ Respondents contend that the equal protection clause of the fourteenth amendment to the United States Constitution and the "privileges and immunities" clause of the state constitution (article 1, section 12) *require* this court to preserve and uphold the college tuition supplement program.

Under respondents' reasoning, whenever the state has a duty to provide a particular service to the public and does so, the state must also reimburse any individual who voluntarily chooses not to take advantage of the service provided, but instead pays a private party to perform the same service. Respondents support this novel theory with no citation of authority.

It should be remembered that state action did not prevent the students at private schools from attending public schools because of their religious beliefs. Rather, the essence of respondents' argument is that the voluntary choice of a different education than that provided for all children by the state must be financed with public funds. We disagree. No violation of the equal protection provisions of the constitutions has been shown.

In summary, in the grades 1-12 case (Weiss v. Bruno), we hold that the challenged portion of Laws of 1972, 1st Ex.

232

Sess., ch. 155, § 10, p. 494, quoted at page 202, and the administrative plan adopted pursuant thereto violate both article 9, section 4 of the Washington State Constitution and the establishment clause of the first amendment to the United States Constitution. In the case of the college tuition supplement program (Weiss v. O'Brien), we hold that Laws of 1971, 1st Ex. Sess., ch. 56, now codified as RCW 28B.10.830-.836, and the administrative plan adopted pursuant thereto violate article 9, section 4 of the Washington State Constitution, both on the face of the act and as applied to the individual recipient institutions in question.

In both of these cases, the respective state officers who are parties to these actions are prohibited from disbursing funds under these programs.

HALE, C.J., FINLEY, ROSELLINI, HUNTER, HAMILTON, STAFFORD, WRIGHT, and UTTER, JJ., concur.

Petition for rehearing denied July 17, 1973.