Honorable Harold Hochstatter State Senator, 13th District Honorable Rosemary McAuliffe State Senator, 1st District Senate Committee on Education 219 John A. Cherberg Building PO Box 40482 Olympia, Washington 98504-0482
Dear Senators Hochstatter and McAuliffe:
By letter previously acknowledged, you requested our opinion on two questions we have paraphrased as follows[1]:
 Legislation was proposed in the 1998 legislative session which would have required fingerprint-background checks on all employees of private schools with regular unsupervised access to children. The proposal included an appropriation of state funds to pay for part of the cost of these checks. Would such legislation constitute a gift of public funds or lending of state credit in violation of the State Constitution?
 Some of the private schools covered by the legislation mentioned in Question 1 are affiliated with churches or religious institutions and offer religious instruction or conduct religious services. Would paying for fingerprint-background checks for the employees of such schools violate article I, section 11, or article IX, section 4, of the State Constitution?
 BRIEF ANSWER
For the reasons stated in the analysis below, we answer both of your questions in the negative. Our answer is limited to the particular proposed bill attached to your request.
 ANALYSIS
Your questions are asked in the context of a specific bill proposed in the 1998 Session of the Legislature.[2] The bill was not enacted. The bill in question consisted of three sections. Section 1 would: (1) require all private schools approved under chapter 28A.195 RCW to require fingerprint-background checks on all employees who have regularly scheduled, unsupervised access to children and were hired before July 1, 1998; (2) include a record check through the state patrol criminal identification system and the federal bureau of investigation; (3) also include a fingerprint check; (4) exempt certificated employees who have already had such a check under RCW 28A.410.010 and (5) provide that private schools are not obligated to pay for these checks. Section 2 of the bill would impose a similar requirement for fingerprint and background record checks on future employees of private schools, and would provide that the private school or hiring contractor would decide who would pay the costs associated with the record check. Section 3 would appropriate money to the superintendent of public instruction to pay for the record checks required by section 1.
 Legislation was proposed in the 1998 legislative session which would have required fingerprint-background checks on all employees of private schools with regular unsupervised access to children. The proposal included an appropriation of state funds to pay for part of the cost of these checks. Would such legislation constitute a gift of public funds or lending of state credit in violation of the State Constitution?
Article VIIII, § 5 of the State Constitution provides as follows:
 The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation.
Const. art. VIII, § 5.
This provision is commonly read as co-extensive with article VIII, § 7, a parallel provision for local governments which reads:
 No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.[3]
CLEAN v. State, 130 Wn.2d 782, 797, 928 P.2d 1054 (1996).
The most useful recent analytical framework for analyzing a law in light of article VIII, §§ 5 and 7, can be found in CLEAN v. State,130 Wn.2d 782, 928 P.2d 1043 (1996). The CLEAN case was a challenge to a bill authorizing the expenditure of public funds on a new baseball stadium. The challengers alleged that the primary beneficiary of the stadium was not the public but the major league baseball team expected to be the stadium's primary tenant. In upholding the constitutionality of the statute, the Court engaged in a two-step analysis:
 . . . First, the court asks if the funds are being expended to carry out a fundamental purpose of the government? If the answer to that question is yes, then no gift of public funds has been made. The second prong comes into play only when the expenditures are held to not serve fundamental purposes of government. The court then focuses on the consideration received by the public for the expenditure of public funds and the donative intent of the appropriating body in order to determine whether or not a gift has occurred.
Id., 130 Wn.2d at 797-798.[4]
Applying this two-prong analysis to the attached proposed bill, we note, first of all, that the bill's express purpose is to protect young children, as stated in the bill's opening sentence. Evidently, the drafters of the bill have identified private schools as one place where young children spend time under the supervision of adults other than their parents or guardians and are, therefore, at potential risk to their safety and welfare. Record checks are already required for public school employees. RCW 28A.400.303. Furthermore, all certificated school employees must be checked in order to obtain their certificates. RCW28A.410.010.
The evident purpose of requiring record checks on private school employees is not to confer some benefit on the private school but to protect the safety of the children who attend the school. Absent a statutory requirement, private schools might not choose to inquire into the backgrounds of the employees they hire. With the required checks, the state obtains some measure of assurance about the welfare of children during the time when the children are away from their parents and are engaged in an activity education — that is mandated by state law.
We think the protection of children, especially in the course of their education, would likely be held by the courts to be a fundamental governmental purpose. The State Supreme Court came close to saying so explicitly in Johnson v. Johnson, 96 Wn.2d 255,634 P.2d 877 (1981), in which the Court upheld a statute directing the Department of Social and Health Services to collect unpaid child support from non-custodial divorced parents. The Court found that this practice, while incidentally benefiting private parties (the child and the other parent) served a clear public purpose keeping children off the public welfare rolls and helping to assure their adequate support. Although the Johnson opinion spoke in terms of "recognized governmental function" rather than using the term "fundamental governmental purpose," the analysis suggests that, had it used the two-prong analysis used in CLEAN fifteen years later, the Johnson court would have found a fundamental purpose served by the legislation in question.
However, even if the courts were to find that the bill did not serve a fundamental public purpose, we think the proposed bill attached to your request would also meet the second prong of the CLEAN test. As noted earlier, the beneficiaries of the bill are the public and the children in the schools, not the schools themselves. The "benefit" received by a private school from having its employees checked is relatively minor and incidental compared to the public benefit.[5] Furthermore, we see no evidence of donative intent in the language of the bill. Accordingly, we reach the opinion that it would not be unconstitutional for the state to pay for the background checks of certain private school employees.[6]
 Some of the private schools covered by the legislation mentioned in Question 1 are affiliated with churches or religious institutions and offer religious instruction or conduct religious services. Would paying for fingerprint-background checks for the employees of such schools violate article I, section 11, or article IX, section 4, of the State Constitution?
Article I, section 11, of the State Constitution provides in relevant part as follows:
 Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state. No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment. . . .
Const. art. I, § 11. (Emphasis added.)
Article IX, section 4 provides as follows:
 All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence.
The proposal you ask about would appropriate public funds to the Superintendent of Public Instruction to reimburse the Washington State Patrol for the costs of conducting the background and fingerprint checks required for private school employees under section 1 of the bill. However, we do not believe that public funds would thereby be "appropriated" or "applied" to religious worship, exercise or instruction, or in support of any religious establishment, simply because some of the employees checked by the State Patrol might work for sectarian institutions. As with the analysis on gift of public funds, the primary beneficiary of the appropriation would be the State itself, acting in protection of the State's children. Any benefit to the school, much less to its sectarian parent organization, is incidental and slight.
Our courts have interpreted article I, section 11 very strictly to prohibit the use of public funds to support sectarian schools, but the cases are distinguishable from the subject of your questions. In Mitchell v. Consolidated School Dist. No. 201, 17 Wn.2d 61,135 P.2d 79 (1943), the State Supreme Court struck down a statute granting students at private schools bus transportation on the same basis as available to public school students, holding that transportation was a direct benefit to the school and that, as to sectarian schools, such a benefit would violate article 1, section 11, among other provisions. In Weiss v. Bruno, 82 Wn.2d 199,509 P.2d 973 (1973), the Court struck down a statute granting tuition assistance to needy and disadvantaged students at public and private schools, on much the same basis. More recently, in Witters v. Commission for the Blind, 112 Wn.2d 363, 771 P.2d 1119, cert.denied 493 U.S. 850, 110 S.Ct. 147, 107 L.Ed.2d. 106 (1989), the Court found that it would violate article 1, section 11, to grant vocational assistance to a blind student who wished to use the money for a Bible studies degree to assist him in becoming a minister. In each of these cases, however, the public funds in question would have directly supported sectarian education and training. Even the closest case factually to your questions — bus transportation — would have directly facilitated the activities of sectarian schools by delivering the students to the classroom at public expense.
The recent case of Malyon v. Pierce County, 131 Wn.2d 779,935 P.2d 1272 (1997) supports our analysis that an incidental benefit to a religious institution, in and of itself, does not render a state program unconstitutional. In Malyon, a citizen challenged a program which supplied counselors to employees in the sheriff's office. The counseling was primarily secular in purpose and in content, but some of the counselors were clergymen, and if requested by the employee, religion was sometimes discussed in the counseling sessions. The counselors (also called "chaplains") were not paid from public funds, but did use public space for their counseling and were reimbursed for certain expenses. The State Supreme Court upheld this program, finding that any benefit to religion was slight and incidental, and that the program did not amount to an "appropriation" of public resources for a religious purpose. The proposed bill would, if enacted, have a secular purpose and function: protecting children by checking the backgrounds of those caring for them. Religiously-affiliated private schools would benefit from the program only tangentially.
Article IX, section 4, also seems inapposite to the facts you have described. This section applies only if the state's willingness to pay for some of the background checks on school employees is defined as "support" or "maintenance" of the school. As noted earlier, the background checks are primarily for the benefit of the students, and only incidentally "benefit" the school. Since the background checks were not historically required, the bill could not be interpreted as relieving the schools of a pre-existing obligation. Once an employee's background check has been completed, it is useful primarily to (1) the students under the employee's care, and to (2) the employee, and then secondarily to (3) the employee's current employer and to potential future employers. Thus, the cost of the background check is not "support" to the school except in the incidental way that the school will be able to assure parents that its employees have been properly checked, without having to pay for the checking.
We think the proposal to pay for background checks on certain employees is also somewhat analogous to the facts considered in AGLO 1980 No. 7 (copy attached). In that opinion, we analyzed an appropriation which permitted the disbursement of state funds to private (including church-related) schools for the administration of a mandatory school immunization program. We found that it would not be constitutional to disburse funds to private schools, partly because of an absence of statutory authority for such a practice and partly because it would violate article VIII, section 7[7]
(gifts of public funds) and article IX, section 4 of the State Constitution.[8] However, we went on to suggest that a different result would be obtained if the funds were disbursed to a public agency rather than directly to the private schools:
 Conceivably, however, the legislature could amend the law so as to provide that, in the case, of private schools, a public agency such as the local health department, or, perhaps, the Department of Social and Health Services — or any other public agency for that matter — would be responsible for administering the immunization law. Funds could then be disbursed to that public agency to defray the administrative expenses involved (assuming that such disbursements were statutorily authorized) without running afoul of any of the above-cited constitutional provisions, state or federal.
AGLO 1980 No. 7 at pp. 3-4.
In our opinion, conducting background checks on those with frequent contact with children is closely analogous to immunizing children against disease — both are conducted to protect the public health and welfare. Furthermore, in both cases the state is acting to reach the children where they happen to be — in private school but is not acting to benefit or support the activities of the private schools, sectarian or otherwise.[9]
We conclude that the proposed bill, in appropriating state funds for background checks for certain employees of private schools, would not operate to support or facilitate sectarian instruction or other sectarian activity, except in the most incidental, attenuated way. Thus, we conclude that the bill as written would not be inconsistent with article I, section 11, or article IX, section 4, of the State Constitution.[10] In closing, we again emphasize that our analysis is limited to the specific provisions of the bill you asked us to review, and any changes in the facts would substantially change our answer. As we noted above, the courts construe article I, section 11, and article IX, section 4 very strictly; any bill which would benefit religious institutions or religious education, even indirectly, would be scrutinized very closely. Furthermore, our analysis of the constitutionality of the bill should not be construed as either support or opposition to the proposal on its merits.
We trust the foregoing will be of use to you.
Very truly yours,
CHRISTINE O. GREGOIRE Attorney General
JAMES K. PHARRIS Sr. Assistant Attorney General
Enclosures: AGLO 1980 No. 7
Bill Proposal
[1] In your opinion request, you asked first for an informal opinion to be provided before the end of the 1998 legislative session, and then for a formal opinion when we had time to fully research the issues. We provided the informal opinion in the form of a letter (Letter to Senator Harold Hochstatter and Senator Rosemary McAuliffe from James K. Pharris, Sr. Assistant Attorney General, dated March 3, 1998). This formal opinion expands on the analysis in the March 3 letter.
[2] You attached the proposal to your request, and we attach it to this Opinion. A similar bill was introduced in the 1998 Legislature as Senate Bill 6573. However, there are significant differences between the proposal attached to your request and Senate Bill 6573, which was eventually replaced by Substitute Senate Bill 6573. Our analysis is confined to the proposal attached to your request.
[3] Despite the differences in wording between these two sections of the Constitution, the courts have construed them to be identical. See, e.g. Tacoma v. Taxpayers, 108 Wn.2d 679,743 P.2d 793 (1987). Thus, cases construing either section are of equal utility in interpreting the other.
[4] In CLEAN, the Court found that building a stadium was not afundamental governmental purpose and, therefore, reached the second prong of the analysis. However, the Court went on to find that (1) building the stadium did serve a public purpose, albeit not a fundamental one; (2) the public would receive constitutionally adequate consideration; and (3) there was no evidence of donative intent behind the authorizing of the expenditure.
[5] We note that the bill would result in no transfer of public funds or property to any private school, nor would the bill result in relieving the schools of a pre-existing financial obligation. Under current law, private schools have no such obligation.
[6] Although it does not change our analysis, we note that the proposal attached to your request would only provide public funds for the initial "one time" cost of conducting background checks on current private school employees. As to future employees, the bill contains no appropriation, and instructs the schools and their hiring contractors to determine who would pay for these checks.
[7] It would probably have been more technically correct to cite article VIII, section 5 since a state appropriation was involved. See discussion above.
[8] AGLO 1980 No. 7 did not find that the appropriation under consideration would violate article I, section 11.
[9] Note also AGO 1997 No. 4, in which we found that including church-related educational institutions in a statewide school computer network would not in itself violate article I, section 11 or other provisions of the Constitutions. However, the Opinion reserved judgment on possible uses of the computer network.
[10] The United States Constitution, in Amendment 1, also prohibits laws ". . . respecting an establishment of religion. . . ." None of the cases construing this language appear to call into question practices as indirectly connected to the establishment of religion as Senate Bill 6573. See, e.g. Zobrest v. Catalina Foothills School Dist., 509 U.S. 1, 113 S.Ct. 2462,125 L.Ed.2d 1 (1993), in which the Supreme Court held that a state could constitutionally provide a sign-language interpreter for a deaf student attending classes at a sectarian high school. The practice upheld in Zobrest, which directly facilitates the school's instructional program, is far closer to an "establishment" of religion than conducting background checks on school employees. Thus, we think it is highly unlikely that Senate Bill 6573 would be found to violate the federal Constitution.