**Richard GARNETT, et al., Plaintiffs,**

v.

**RENTON SCHOOL DISTRICT, et al., Defendants.**

**No. C87–1294M.**

United States District Court, W.D. Washington, at Seattle.

Aug. 15, 1991.

Steven Timothy McFarland, William Homer Ellis, Jr., Ellis & Li, Seattle, Wash., for plaintiffs Richard Garnett, Scott Germino, Jack and Robert Ryan, Peggy Smith and Michael and Richard Tracy.

Steven Timothy McFarland, William Homer Ellis, Jr., Ellis & Li, Scott M. Stickney, Bullivant, Houser, Bailey, Pendergross & Hoffman, Seattle, Wash., for plaintiff Margarita Prentice.

Scott M. Stickney, Bullivant, Houser, Bailey, Pendergross & Hoffman, Seattle, Wash., for all defendants.

Marc Slonim, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, Wash., for amici American Civil Liberties Union of Wa Foundation and American Jewish Committee.

R. Broh Landsman, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash., for amicus Anti–Defamation League of B'nai B'rith.

## ORDER ON REMAND

McGOVERN, District Judge.

### I.  INTRODUCTION.

The United States Supreme Court reversed the Ninth Circuit's affirmation of this Court's order that concluded Defendants had not created a limited open forum, and that even if it had, the Equal Access Act by its own terms cannot operate to require activity prohibited under the Washington constitution.  On remand, the Ninth Circuit received additional briefs then remanded the matter to the District Court for resolution of the issues raised.

A review of the student groups now present at Lindbergh High School reveals that noncurriculum-related student groups meet or have an opportunity to meet on the school's premises, creating a "limited open forum" under the Equal Access Act.  The Washington constitution, however, precludes the Act from requiring the use of school premises by a religious club.  The

Supremacy Clause of the United States Constitution does not bar the Washington constitution from limiting application of the Act. The Act itself provides that it does not operate to require activity that would abridge constitutional rights.

## II. REVIEW OF STUDENT GROUPS.

██ The Court has reviewed the parties' briefs concerning whether the Equal Access Act (EAA) was triggered in September 1987 and presently remains applicable to Lindbergh High School. The parties have agreed that four student groups are noncurriculum related (Pep Club, Chess Club, Girls' Club, and Ski Club) and four student groups are curriculum related (DECA: Distributive Education Club of America, DOCA: Diversified Occupation Club of America, VICA: Vocational Industrial Club of America, LIMITS: Computer Club); they disagree as to the proper designation of seven student groups (Bowling Club, SKY Club, International Club, Varsity Club, Minority Student Union, Dance Squad, FBLA: Future Business Leaders of America).

Each of the seven student groups on which the parties disagree will be reviewed under the criteria for evaluating student groups set forth in *Board of Education of Westside Community Schools v. Mergens*, 495 U.S. ——, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). *Mergens* set forth the criteria as follows:

> In light of this legislative purpose, we think that the term "noncurriculum related student group" is best interpreted broadly to mean any student group that does not directly relate to the body of courses offered by the school. In our view, a student group directly relates to a school's curriculum if the subject matter of the group is actually taught, or will soon be taught, in a regularly offered course; if the subject matter of the group concerns the body of courses as a whole; if participation in the group is required for a particular course; or if participation in the group results in academic credit.

Applying this criteria to the disputed student groups, the Court concludes as follows:

1. *Bowling Club.* Bowling is not taught in a regularly offered course. While Bowling Club members may participate in intermural tournaments with other public high schools, this fact is irrelevant in applying the *Mergens* test.

The Bowling Club is a noncurriculum related student group.

2. *SKY (Special Kiwanis Youth) Club.* SKY Club's purpose is to help people in need. As part of the Academic Challenge Program (a more rigorous academic program), participating students must satisfy certain academic and competency requirements and complete two community service projects. SKY Club, as well as the ACLU, churches, political parties, and Greenpeace, etc., are listed on the Volunteer Service Project Source List to assist students in completing the community service requirement. A "Certificate of Achievement" is awarded upon students satisfactorily completing the Program.

The Program serves to enrich and broaden students' education. A Certificate of Achievement for completion of the entire program is not the same as academic credit for course work components. Students are not required to participate in SKY Club in connection with a class. Handicaps and disabilities are not the subject matter of any regularly offered course at Lindbergh High School, and the club advisor (who is not paid for this duty) does not prepare lessons or educate on this subject, but sometimes leads discussions.

The Program brings academic course work together with community service projects. The community service element is not sufficiently related by virtue of being part of a particular program to qualify it as curriculum related under *Mergens*.

SKY Club is a noncurriculum related student group.

3. *International Club.* This club provides a means for the exchange of ideas and information about the cultures of exchange students from different countries.

While all the foreign language teachers participate in the Club and urge their students to participate also, and while a goal shared by the Club and the study of a foreign language is cultural understanding, these facts are insufficient for curriculum relatedness. The exchange of personal cultural experiences among students in the Club is not a subject that is actually taught and for which credit is received. Foreign languages are taught, but International Club activities are not woven into the actual course work as a required element for foreign language credit.

International Club is a noncurriculum related student group.

4. *Varsity (formerly Lettermen's) Club*. Varsity Club is inactive; it did not meet during the 1987–88 school year and met twice last year. This Club remains on the School District's Master List, which means it is authorized to meet without further Board Action; thus, an opportunity for Varsity Club to meet is provided. Varsity Club does not have a constitution, but its faculty advisor said its purpose is to provide public service to the school and surrounding community through beautification projects, parking assistance, outside ministry to rest homes, and services to the needy. No course requires participation in Varsity Club, nor is academic credit conferred for participation.

As constituted in the past, Varsity Club is a noncurriculum related student group.

5. *Minority Student Union*. The MSU discusses cultural activities, human relations skills, SAT testing information, and offers the student body a black history program in February. The MSU "enhances some things taught in the social studies program."

The subject matter of the MSU is not taught in a regularly offered course, and participation in MSU is not required for any course.

The Minority Student Union is a noncurriculum related student group.

6. *Dance Squad*. The Squad's constitution states that its purpose is to promote school spirit and to provide extra-curricular activity at athletic and social functions. Participation is not required for any course, nor is credit conferred for participation. Students may, however, petition to substitute Dance Squad participation for one of their physical education credits. It is not stated what criteria are used to determine whether a student's petition will result in a P.E. credit being conferred.

Dance Squad's curriculum relationship as presently constituted is too tenuous to meet the *Mergens* test. Moreover, allowing for petitions to receive academic credit for a student group could provide a convenient pretext to avoid triggering the Equal Access Act. The *Mergens* criteria require a consideration of substance and not just appearance.

The Dance Squad is a noncurriculum related student group.

7. *FBLA (Future Business Leaders of America)*. District and State guidelines require Lindbergh High to offer FBLA or a similar program to students enrolled in business classes. Business class students are not required to participate in FBLA but are encouraged to do so by their teachers. No academic credit is given for FBLA participation. The faculty advisor generally does not instruct members or plan club meetings or activities.

The FBLA does not meet the *Mergens* standard. Where such an activity as the FBLA is required to be offered, a school desiring to avoid creating a limited open forum would have to adjust class requirements, provide instruction in FBLA meetings, or drop business classes. These problems are irrelevant in assessing the substantive curriculum relatedness of a student group under *Mergens*.

The FBLA is a noncurriculum related student group.

There are, therefore, eleven noncurriculum related student groups at Lindbergh High School. The presence of such groups, or of the opportunity of such groups to meet, results in the creation of a "limited open forum" under the Equal Access Act. 20 U.S.C. § 4071.

The remaining issues to be addressed are (1) whether Congress intended to preempt contrary state and local law and, if not, (2) whether the Washington state constitution prevents the enforcement of the Equal Access Act at public schools within the State of Washington.

### III. EFFECT OF TRIGGERING EQUAL ACCESS ACT.

1. *The Washington Constitution.* While the presence of noncurriculum related student groups meeting on Lindbergh High premises creates a "limited open forum," nevertheless, the Washington constitution prevents application of the Equal Access Act (EAA) to allow a religious meeting on any public high school premises in Washington.

The Court's conclusion in the Order Denying Plaintiff's Motion for Preliminary Injunction is adopted herein as follows.

The EAA seeks to provide a constitutional means for public schools to allow religious as well as secular groups to use school premises, so long as there is no school sponsorship of a religious group initiated by students. The question then becomes whether the neutral operation of a law that would bring religious clubs onto school premises—albeit without school sponsorship or teacher supervision or assistance—would appear to create an impermissible atmosphere of religious partisanship.

■ The answer in Washington State is yes. The mandatory provisions of the EAA may not be applied in Washington State to permit religious organizations to meet on school premises owing to provisions of this state's constitution and relevant case law construing their application. The Washington Constitution "requires a far stricter separation of church and state than the federal constitution...." *Witters v. Commission for the Blind,* 102 Wash.2d 624, 626, 689 P.2d 53 (1984), *rev'd sub nom. on other grounds, Witters v. Washington Dept. of Services for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986). Two provisions of the state constitution prohibit the relief requested here. Article I, section 2 denies religious groups any use of public money or property:

> No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment.

Article IX, section 4 expressly forbids any sectarian influence in the public schools:

> All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence.

Plaintiffs' requested relief is prohibited because it would (1) tend to introduce sectarian influence into Lindbergh High School and (2) result in an impermissible appropriation of public money or property for religious worship or exercise. First, the prohibition of sectarian influence or control is absolute under Article IX, section 4:

> While the establishment clause broadly condemns any law "respecting an establishment of religion," our constitution specifically demands that no public funds be used to maintain or support any school which is under sectarian control or influence. *There is no such thing as a 'de minimis' violation* of Article 9, section 4. Nor is a violation of this provision determined by means of a balancing process. The words of Article 9, section 4 mean precisely what they say: *the prohibition is absolute.*

(Citations omitted, emphasis supplied.) *Weiss v. Bruno,* 82 Wash.2d 199, 206, 509 P.2d 973 (1973). *Weiss* concerned state tuition assistance whereby the student recipient could choose to attend schools with or without religious sponsorship. Because a portion of the grant funds went to students attending parochial school, the Washington Supreme Court held the program unconstitutional, stating:

> Any use of public funds that benefits schools under sectarian control or influence—regardless of whether that benefit is characterized as "indirect" or "incidental"—violates this provision.

82 Wash.2d at 211, 509 P.2d 973. The Court further held:

> Const. art. 9, 4 does not provide that a minimal amount of sectarian control or influence is permissible. We cannot say that any of these schools is completely free from such influence.

82 Wash.2d at 228, 509 P.2d 973. The Anti–Defamation League of B'nai B'rith (ADL) argues, and the Court agrees, that if Bible study groups are allowed to meet on school premises during the school day, Lindbergh High School will no longer be *completely free* from sectarian influence:

> Plaintiffs, who by filing this suit have demonstrated drive, initiative and deep religious feelings, undoubtedly will have substantial influence within the school. Article IX section 4 prohibits all sectarian influence in the public schools, no matter how slight. The considerable influence that plaintiffs' religious group is likely to have in Lindbergh High School is not permitted by the state constitution.

ADL Memorandum at 7. The proscription of "influence" as well as "control" by sectarian elements was a conscious decision:

> It is indisputable that this more restrictive clause was the deliberate design of the framers of our constitution. The statehood compact with the United States required that provision be made for a public school system free from sectarian *control.* . . . Obviously not satisfied with the broader concept of control, the authors of our constitution added the words "or influence." A motion to strike those words failed.

(Emphasis in original, citations omitted.) 82 Wash.2d at 206, 509 P.2d 973.

Second, the ban on the use of public funds and property for religious purposes is—like the ban of influence and control by sectarian elements—absolute and without exception. The use of a public school's property for the purposes of religious club meetings is a patent violation of Article IX, section 4 of the Washington State Constitution. That there is also no de minimis appropriation of money or property for a religious purpose is demonstrated by *Perry v. School District No. 81*, 54 Wash.2d 886, 344 P.2d 1036 (1959). There, a program permitting students to be released from school for religious study off school premises was held unconstitutional because (1) the program was announced on school bulletin boards and (2) the school distributed cards on which students could express interest in participating in the program. This use of school facilities and personnel to distribute the cards constituted an impermissible "use of school facilities supported by public funds for the promotion of a religious program." *Id.* at 896, 344 P.2d 1036.

Similarly, a program permitting public school students to receive academic credit for religious study outside the school system was declared unconstitutional in *State ex rel. Dearle v. Frazier*, 102 Wash. 369, 173 P. 35 (1918) because the expenditure of time by public school teachers to determine the number of credits to give students for independent religious instruction would constitute an appropriation of funds for religious instruction in violation of Article I, section 2 no matter how small the expenditure of time by the teachers or how slight, indirect, or consequential the benefit to religion.

ADL reasons from the above cases and the Court agrees:

> Plaintiffs here ask for much more substantial public support than was held unconstitutional in *Perry* or in *Frazier*. Plaintiffs seek to hold their meetings on public school property, a direct and unambiguous "application of property" for religious worship or exercise. The use of school personnel to supervise religious clubs for compliance with the federal Equal Access Act and the use of bulletin boards or other common areas of the school to advertise religious club meetings are all uses of public personnel or public funds to support religion. Each is as substantial as the use of school facilities for announcements or the distribution of cards in *Perry* or the use of teacher time in *Frazier* to determine credit for outside religious study.

ADL Memorandum at 9. Finally, ADL contends that a bright line demarcation of

church and state, as provided in Washington's constitution, is the surest approach to maintaining separation of these entities; there can be no tolerance for sectarian influence no matter how slight.

The conclusion is unavoidable that if Plaintiffs were to obtain their requested relief, the meetings of their religious club on school premises would amount to at least a slight benefit to religion, a benefit that is prohibited by Washington's constitution.

■ The EAA does not require the Renton School District to permit an unconstitutional use of school property. The EAA by its own terms does not force Renton School District No. 403 and Lindbergh High School *"to sanction meetings that are otherwise unlawful; ... or to abridge the constitutional rights of any person."* 20 U.S.C. § 4071(d)(5), (7). Under Washington's constitution, meetings of religious groups on school premises would be unconstitutional because such meetings would introduce sectarian influences into the school and because they would result in an impermissible appropriation of public money or property for a religious purpose.

■ 2. *Preemption.* The Supremacy Clause of the Federal Constitution does not bar the Washington constitution from limiting application of the Equal Access Act. The Supreme Court has consistently held that state courts may interpret state constitutions to be more protective of individual rights than the Federal Constitution. *See, e.g., Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 2040–41, 64 L.Ed.2d 741 (1980). In *Northwest Central Pipeline v. Kan. Corp. Com.,* 489 U.S. 493, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989), the Court stated:

> Congress has the power under the Supremacy Clause of Article VI of the Constitution to pre-empt state law. Determining whether it has exercised this power requires that we examine congressional intent. In the absence of explicit statutory language signaling an intent to preempt, we infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law ... or where the state law at issue conflicts with federal law, either because it is impossible to comply with both ... or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives....

489 U.S. at 509, 109 S.Ct. at 1273, 103 L.Ed.2d at 526–27. The Act contains no clear expression of congressional intent to preempt state law. The statute only refers to superseding inconsistent federal law. 20 U.S.C. § 4074. The plain language of the Act is clear that Congress did not legislate so comprehensively as to occupy an entire field of regulation:

> Nothing in this [Act] shall be construed to authorize the United States or any State or political subdivision thereof—
> ...
> (5) to sanction meetings that are otherwise unlawful; [or] ...
> (7) to abridge the constitutional rights of any person.

20 U.S.C. § 4071(d). This Court concluded that under these provisions it would be unlawful and unconstitutional for Defendants to permit Plaintiffs' religious club to meet on LHS premises. These provisions cannot be interpreted as only a means to allow schools to maintain order and discipline, as this is separately provided. Section 4071(f) provides that nothing in the Act

> shall be construed to limit the authority of the school, its agents or employees, to maintain order and discipline on school premises, to protect the well-being of students and faculty, and to assure that attendance of students at meetings is voluntary.

Section 4071(c)(4) adds that a school need not allow meetings that "materially and substantially interfere with the orderly conduct of educational activities within the school." Congress' explicit reference to the "constitutional rights of any person" cannot reasonably be limited to a school's interest in maintaining order and discipline.

Congress was surely aware of provisions in the Washington constitution that mandate absolute separation of government

and religion. Senator Slade Gorton specifically referred to Washington's constitutional provision in commenting upon a proposed Constitutional amendment prior to the Congress enacting the Equal Access Act. (*See* 130 Cong.Rec. S2883 (Daily ed. March 20, 1984)). State constitutional provisions were not preempted by virtue of 4071(d)(5) and (7).

Moreover, in the Enabling Act allowing creation of the State of Washington, Congress commanded that the Washington constitution contain the following:

> [P]rovision shall be made for the establishment and maintenance of systems of public schools, which shall be open to all children of said State, and free from sectarian control.

Act of Feb. 22, 1889, ch. 180, § 4, 25 Stat. 676. The Washington constitution incorporates that language with the additional words "or influence" after "sectarian control."

Legislative history makes it clear that Congress simply wanted to provide that if a public secondary school permits student groups to meet for student-initiated activity not related to the curriculum, the school must allow other groups to meet to discuss religious, political, philosophical or other issues. The Act, however, is entirely devoid of *any* manifestation of intent to require schools to violate statutory or constitutional provisions. Indeed, the Act explicitly allows local authorities to comply with state statutory and constitutional provisions. There is no intent to displace the Washington constitution.

## IV. CONCLUSION.

In summary, noncurriculum related groups are present at Lindbergh High School. The presence of such groups results in the creation of a "limited open forum" under the EAA. When a limited open forum is created, the Act requires that a school allow other noncurriculum related groups, including religious groups, to meet on school premises. The Act does not, however, comprehensively occupy the entire field and specifically refers to the continuing effectiveness of State laws and constitutional rights. There being no preemption, the Washington constitution precludes the use of school premises by a religious club.