EAST HIGH GAY/STRAIGHT ALLI-
ANCE, an unincorporated association;
Ivy Fox, a minor, by and through her
mother and next friend, Kay Kosow Fox;
Keysha Barnes, a minor by and through
her father and next friend, James
Barnes; and Leah Farrel, by and
through her mother and next friend.
Kelly Fogarty, Plaintiffs,

v.

BOARD OF EDUCATION OF SALT
LAKE CITY SCHOOL DISTRICT, a
body corporate of the State of Utah;
Darline Robles, Superintendent of Salt
Lake City School District, in her official
capacity; and Cynthia Seidel, Assistant
Superintendent, in her official capacity,
Defendants.

No. CIV. 2:98–CV–193J.

United States District Court,
D. Utah,
Central Division.

Nov. 24, 1998.

Stephen C. Clark, American Civil Liberties of Utah Foundation, Inc., Salt Lake City, UT, Kelly M. Evans, American Civil Liberties Union, San Francisco, CA, Marlin G. Criddle, Laura M. Gray, Salt Lake City, UT, David S. Buckel, Lambda Legal Defense and Education Fund, New York City, Jon W. Davidson, Lambda Legal Defense and Education Fund, Los Angeles, CA, Daniel K. Slaughter, Heller Ehrman White & McAuliffe, Kathryn D. Kendell, NCLR, San Francisco, CA, for Plaintiffs.

Dan R. Larsen, Elizabeth King, Assistant Utah Attorneys General, Jan Graham, Utah Attorney General, Salt Lake City, UT, for Defendants.

## MEMORANDUM OPINION AND ORDER

JENKINS, Senior District Judge.

Relying solely on their statutory claim under the Equal Access Act, 20 U.S.C. §§ 4071–4074 (1994), plaintiffs seek preliminary injunctive relief prohibiting the defendants from denying the East High Gay/Straight Alliance, Keysha Barnes and Ivy Fox equal access to the "limited open forum" that the defendants allegedly have created for "non-curricular" student clubs at East High School.[1] Granted such access, plaintiffs believe they "could use the public address system for announcements about meetings," post notices, and "pass out fliers at the school fairs and put up information sheets on bulletin boards," enabling them to "make a difference by reaching out to other students who need support" as well as students who "need to get information about antigay stereotypes and bigotry." (Memorandum in Support of Plaintiffs' Motion for Partial Preliminary Relief, filed October 13, 1998 (dkt. no. 60), at 9 (quoting Affidavit of Ivy Fox in Support of Plaintiffs' Motion for Partial Preliminary Relief (dkt.no.61), at ¶¶ 11–12, 14).)

Defendants respond that plaintiffs cannot establish a "clear and unequivocal" right to preliminary relief under the Equal Access Act. In particular, defendants assert that plaintiffs cannot show a likelihood of success on the merits based upon their claim that two student groups cited in their moving papers are "noncurriculum related student groups" within the meaning of the statute. (Memorandum in Opposition to Plaintiffs' Motion for Partial Preliminary Relief, filed November 2, 1998 (dkt. no. 71), at 2–3.) Even if the challenged groups are "non-curricular," defendants argue that plaintiffs cannot show that they will suffer irreparable injury if preliminary relief does not issue, and that the harm to the defendants resulting from a preliminary injunction would outweigh any harm suffered by plaintiffs. A preliminary injunction, defendants assert, would prove disruptive and burdensome and would "undermine defendants['] ability to implement and enforce the district's closed forum policy"—a policy which defendants equate with the public interest. (*Id.* at 12–18.)

### The Equal Access Act

Enacted in 1984, the Equal Access Act, 20 U.S.C. § 4071(b), provides: "A public secondary school has a limited open forum whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time." Where a "limited open forum" exists, the Equal Access Act forbids a public secondary school to "deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a). However, the Equal Access Act as passed by the Congress of the United States does *not* define "noncurriculum related student groups," the essential ingredient creating the statute's "limited open forum." leaving the question of definition for the courts to decide.

### The *Mergens* Case

The Supreme Court, per Justice O'Connor, tried its hand at interpretation of the "non-curriculum related student groups" language

---

1. Plaintiffs' motion does not address West High School; nor does it address all of the student groups at East High School which plaintiffs contend are "non-curricular." *See* Memorandum in Support of Plaintiffs' Motion for Partial Preliminary Relief at 5 n. 3 ("Plaintiffs do not wish to burden the Court with a review of all the student groups that Plaintiffs assert are non-curricular.")

in *Westside Community Board of Education v. Mergens,* 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990):

> We begin, of course, with the language of the statute.... The common meaning of the term "curriculum" is "the whole body of courses offered by an educational institution or one of its branches." Webster's Third New International Dictionary 557 (1976); ... Any sensible interpretation of "noncurriculum related student group" must therefore be anchored in the notion that such student groups are those that are *not* related to the body of courses offered by the school.

496 U.S. at 237, 110 S.Ct. 2356 (emphasis added & citations omitted). The Court then looked to the statute's definition of "meeting" as well as the "logic of the Act" coupled with its "less than helpful" legislative history. *Id.* at 237–39, 110 S.Ct. 2356. Relying on these sources, the *Mergens* Court gave the legislative purpose (*viz.,* to allow non-curricular religious student groups to meet on school premises free from discrimination based on content) a broad reading:

> In light of this legislative purpose, we think that the term "noncurriculum related student group" is best interpreted broadly to mean any student group that does not *directly* relate to the body of courses offered by the school. In our view, a student group directly relates to a school's curriculum if the subject matter of the group is actually taught or will soon be taught, in a regularly offered course; if the subject matter of the group concerns the body of courses as a whole; if participation in the group is required for a particular course; or if participation in the group results in *academic credit.* We think this limited definition of groups that directly relate to the curriculum is a commonsense interpretation of the Act that is consistent with Congress' intent to provide a low threshold for triggering the Act's requirements.

*Id.* at 239–40, 110 S.Ct. 2356 (emphasis in original). Of course, the required determination is fact-driven: "Whether a specific student group is a 'noncurriculum related student group' will therefore depend on a particular school's curriculum, but such determinations would be subject to factual findings well within the competence of trial courts to make." *Id.* at 240, 110 S.Ct. 2356.

Justice O'Connor offered examples illustrating each of the *Mergens* direct relationship criteria:

> (1) *the subject matter of the group is actually taught or will soon be taught, in a regularly offered course*—"a French club would directly relate to the curriculum if a school taught French in a regularly offered course or planned to teach the subject in the near future" (*id.* at 240, 110 S.Ct. 2356);

> (2) *the subject matter of the group concerns the body of courses as a whole*—"A school's student government would generally relate directly to the curriculum to the extent that it addresses concerns, solicits opinions, and formulates proposals pertaining to the body of courses offered by the school" (*id.*);

> (3) *if participation in the group is required for a particular course*—"If participation in a school's band or orchestra were required for the band or orchestra classes" (*id.*); or

> (4) *if participation in the group results in academic credit*—"If participation in a school's band or orchestra ... resulted in academic credit, then those groups would also directly relate to the curriculum" (*id.*).

As to the first criterion, *Mergens* rejected the suggestion that " 'curriculum related' means anything remotely related to abstract educational goals," such as "promot[ing] effective citizenship." The required relationship depends much more on the substantive content of a specific course compared with the activities of a specific group. "The difficult question," as Justice O'Connor observed in *Mergens,* "is the degree of 'unrelatedness to the curriculum' required for a group to be considered 'noncurriculum related.' " *Id.*

## "Noncurriculum Related Student Groups" at East High School

To show the existence of a "limited open forum" within the meaning of the Equal Access Act, plaintiffs submit that the Future Business Leaders of America (FBLA), the National Honor Society (NHS), and the Improvement Council at East (ICE) present "a

sampling of groups with three different types of subject matters: social, college-oriented, and community service-oriented," each of which plaintiffs contend is "non-curricular."[2] (Memorandum in Support of Plaintiffs' Motion for Partial Preliminary Relief at 5 n. 3.)

As *Mergens* so aptly illustrates, "Passing a statute is but the beginning of a conversation,"[3] a conversation about meaning, about criteria, about facts.

Plaintiffs assert that that *Mergens* prescribes a "straightforward approach[:] hold up the subject matter of a student group next to the subject matter of a corresponding course and see if they are the same.... Once the subject matters of class and club meaningfully diverge, however, the club is non-curricular." (Reply Memorandum in Support of Plaintiffs' Motion for Partial Preliminary Relief, filed November 13, 1998 (dkt. no. 82), at 3.)

How does one measure whether class and club subject matter is "the same" or has "meaningfully diverge[d]?" Plaintiffs assert that "[i]f a creative writing class exclusively does writing exercises, and [a] student writing club exclusively does writing exercises, the club is curricular," *i.e.*, the same. (*Id.*) Plaintiffs suggest that the subject matter of class and club "meaningfully diverge" when a club engages in activities having a social, fund-raising or community service function.

However, one must distinguish between sameness and relatedness. Plaintiffs—not the *Mergens* Court—say "the same." In saying "related"—a word referring to things "connected"[4] in some fashion—the *Mergens* Court did not mean to say "identical."

In general, a secondary school class does not undertake to raise funds, perform com-

munity service, or simply "have fun." A typical secondary school club may do one or all of these things as part of its activities. However, it may be that these functions distinguish "club" from "class" more than they distinguish "non-curricular" from "curricular." If to be deemed "directly related" to the curriculum, a club's subject matter must be limited to instructional activities concerning a class topic, as plaintiffs seem to suggest, then perhaps the group would be better described as a tutorial, or a study group, rather than a club. A "club" seems to be an inescapably *social* organization, even if it has an instructional or informational subject matter or purpose.

Nothing in *Mergens* suggests that Justice O'Connor's French club would become "non-curricular" if it raises funds, or plans social gatherings for the enjoyment of its members, so long as part of its activities involve things French. Indeed, according to *Mergens*, the school's simple description of, *e.g.*, a distributive education club as "an extension of the Distributive Education class," or a Latin club as "designed for those students who are taking Latin as a foreign language," constituted "persuasive evidence that these student clubs directly relate to the curriculum." *Id.* at 246, 110 S.Ct. 2356.[5]

■ To be directly related to a class under *Mergens*, therefore, a club need not be identical to a class.

Defendants, on the other hand, assert that *Mergens* "simply requires that the subject matter of the group directly relates to the subject matter of a class actually taught ...." (Memorandum in Opposition to Plaintiffs' Motion for Partial Preliminary Relief at

2. Though it was argued in *Mergens* that both the Future Business Leaders of America and the National Honor Society were "curriculum related" groups, the Court did not address these groups in reaching its conclusion that the school had permitted non-curricular groups to meet, thus establishing a limited open forum. For the *Mergens* court, the existence of non-curricular chess and scuba diving clubs and a "Peer Advocates" special education group was sufficient to trigger the Equal Access Act's "limited open forum"protections.

3. George Fletcher, *Basic Concepts of Legal Thought* 65 (1996).

4. *Webster's Third New International Dictionary* 1916 (1971).

5. Nor does *Mergens* suggest that a student government would be deemed "curriculum related" only if it confines itself to it addressing concerns, soliciting opinions, and formulating proposals pertaining to the body of courses offered by the school, or that it would be deemed "non-curricular" if it undertakes to raise funds, plan social events or engage in community service.

8.) To determine whether a club "directly relates" to a class, defendants point to the substantive "core" of what a club is doing and why it exists. That substantive "core" is then compared with the course curriculum using a "comparative-relatedness balancing test" derived from *Mergens:*

> [T]he Act is premised on the notion that a religious or political club is itself likely to be a noncurriculum-related student group. It follows, then, that a student group that is "curriculum related" must at least have a more direct relationship to the curriculum than a religious or political club would have.

*Mergens,* 496 U.S. at 238, 110 S.Ct. 2356. *See also Pope v. East Brunswick Board of Education,* 12 F.3d 1244, 1253 (3d Cir.1993). To what extent this balancing test can assist in resolving Justice O'Connor's "difficult question of degree" remains unclear. How does one weigh the curriculum relatedness of an existing student group against the hypothetical subject matter of "a religious or political club" not yet established? Applying this criterion, the existence of a limited open forum under the statute would depend as much on the collective breadth of vision of court and counsel as anything else. *See, e.g., Pope,* 12 F.3d at 1253–54 (a Bible Club may be more directly related to the curriculum than a Key Club; "[i]t is evident that the Bible relates generally to subjects taught in high school" and if the Bible's "greater influence on Western civilization, history and thought" is weighed against "the Key Club's food and toy drives," then "the Key Club is found wanting").

■ To be sure, "a curriculum related student group is one that has more than just a tangential or attenuated relationship to courses offered by the school." *Mergens,* 496 U.S. at 238, 110 S.Ct. 2356. Yet the required analysis under *Mergens* appears to be qualitative rather than quantitative; if at least part of a club's activities enhance, extend, or reinforce the specific subject matter of a class in some meaningful way, then the relationship between club and class is more than tangential or attentuated, and the club may be "directly related" to the class in terms of its subject matter.[6] Where that is not the case, club and class have "meaningfully diverged," and the club may be "noncurricular" under § 4071(b).[7]

Recognizing that *Mergens'* definition of "noncurriculum related student activities" expressly "looks to a school's actual practice rather than its stated policy," 496 U.S. at 246, 110 S.Ct. 2356, the examination nevertheless proves to be macroscopic, not microscopic. Even as to groups challenged in that case, *Mergens* did not assay each and every student activity for its substantive course content. It follows that curriculum-related student clubs, like non-curricular student clubs, may function as *clubs*—members may socialize, raise funds, and even assist others as part of their group activities—without altering the club's status under the statute.

### Future Business Leaders of America (FBLA)

Plaintiffs submit that the Future Business Leaders of America (FBLA) at East High School constitutes "without question" a "noncurricular" student group: "socializing is the most significant component to the FBLA group's subject matter." (Memorandum in Support of Plaintiffs' Motion for Partial Preliminary Relief at 31.) Looking to FBLA's activities over the past year. plaintiffs counted "'socials' (six in number), 'business career preparation' (four in number), 'fundraising' (three in number), and 'community service' (three in number)." (*Id.* at 10.) In number and level of participation, the social events were the "most significant." (*Id.* at 32.)

---

6. Where a curriculum-related group in some meaningful way *also* expresses or advocates specific subject matter *not* encompassed within the subject matter of a class, (*e.g.,* a French Club organizing a "Free Quebec" demonstration and distributing pro-independence leaflets), the group may nevertheless be deemed "noncurriculum related" under § 4071(b), thus giving credence to the statute's core concerns about speech and advocacy by student groups and equal access to a forum for that purpose.

7. This may be what the Third Circuit was driving at in *Pope* when it said "the curriculum-relatedness of a student activity must be determined by reference to the primary focus of the activity measured against the significant topics taught in the course that assertedly relates to the group." 12 F.3d at 1253.

Less significant were activities designed to "explore and improve career opportunities," including a fall leadership conference, a guest speaker, a field trip to a local candy manufacturer and a spring business education competition .[8] (*Id.* at 32–33.)

Plaintiffs also point to *Garnett v. Renton School District,* 772 F.Supp. 531 (W.D.Wash. 1991), *rev'd on other grounds,* 987 F.2d 641 (9th Cir.1993), as support for the proposition that FBLA is a non-curricular group. The district court in *Garnett* found as much, noting that "[t]he faculty advisor generally does noninstruct members" and that "to avoid creating a limited open forum," the school must "provide instruction in FBLA meetings," among other options. 772 F.Supp. at 534.

Defendants respond by emphasizing the career preparation activities, which "provide learning experiences and career-related activities to assist students in reaching their professional goals in business," and "closely match the courses in the East High School Business Department," such as the Business Management, All About Business, Word Processing, Information Processing, and Accounting courses. (Memorandum in Opposition to Plaintiffs' Motion for Partial Preliminary Relief at viii ¶¶ 29–30, 6.) They assert that "FBLA and other vocational student leadership organizations are a vital component of the school-to-work programs in the area of applied technology education." (*Id.* at 6.)

Defendants also point out that "academic credit" of a sort is available to students actively involved in FBLA: the club's faculty advisor awards "extra credit in the form of a three percent grade increase" to FBLA members in her classes who participate in FBLA activities. (*Id.* at xiii ¶ 47; Affidavit of Connie Clements, filed November 2, 1998 (dkt. no. 75), at ¶ 24.)

This court has reviewed the parties' memoranda as well as the accompanying affidavits and exhibits, including the deposition transcripts. The documentation is extensive. The pertinent facts are numerous. The controversy is genuine.

■ From the factual materials now before this court, however, it appears that the FBLA actually engages in activities which enhance, extend, or reinforce the specific subject matter of one or more business classes in a meaningful way and are thus "directly related" to the school's curriculum under § 4071(b) as read in *Mergens.* The most significant overlap between course content and FBLA activities involves the Business Management course. Among the stated goals of that course are the following:

2. Develop an understanding of the economic principles that influence business decisions.

\* \* \* \* \* \*

4. Explore career opportunities, consumer issues, and other aspects of personal economics.

5. Provide hands-on experience in the operation of a business enterprise, and have weekly contact with representatives of the business community.

(Business Management Course Description, in Exhibit "E" to Affidavit of Cynthia L. Seidel, filed November 2,1998 (dkt. no. 73).) All of the FBLA activities cited by plaintiffs as being designed to "explore and improve career opportunities" extend or reinforce the defined subject matter of the Business Management course—especially its stated goal to "explore career opportunities." Further, the FBLA spring competition appears to reinforce student skills learned in word and information processing classes, accounting classes, introductory business classes, business law classes, and communications classes, among others.

Nor can this court ignore FBLA's origins. FBLA was not created in a vacuum; it represents one component of a federally funded initiative starting with the Vocational Act of 1963 and encouraging education in "applied technology" or "school-to-work" programs to better prepare students to join the workforce following the completion of their studies. Federal and state funds are specifically earmarked for schools sponsoring groups such

---

**8.** Plaintiffs do not suggest that FBLA at East High engages in advocacy of substantive subject matter beyond the scope of East High's business and applied technology curriculum, or other non-curricular speech of concern under the Equal Access Act.

as FBLA—in Utah, an amount approximating one percent of the total applied technology education budget. Those who earmark the funds clearly perceive a direct relationship between FBLA (and related groups) and the applied technology course curriculum those funds support.

Plaintiffs have failed to carry their burden to show a likelihood of success on the merits of their claim that the presence of Future Business Leaders of America at East High School creates a limited open forum under § 4071(b) of the Equal Access Act.[9]

### National Honor Society (NHS)

Plaintiffs characterize the National Honor Society's subject matter as "recognition of general academic achievement, community service, and a winter social to get advice from alumni—with all three of these having a college-orientation." (Memorandum in Support of Plaintiffs' Motion for Partial Preliminary Relief at 35.) They reject the assertion that NHS "concerns the body of courses as a whole" under *Mergens* because "there is nothing in the activities or the subject matter of NHS to suggest it reflects any similarity to a student government body that provides input to schools officials about the curriculum." (*Id.* at 37.)

Responding that "the 'directly related to the curriculum as a whole' test in *Mergens* is vague at best," defendants assert that "NHS's purpose is simple—to honor students who have achieved academic excellence and to encourage them to maintain their academic performance in all classes." (Memorandum in Opposition to Plaintiffs' Motion for Partial Preliminary Relief at 11.)

Plaintiffs reply that the NHS subject matter so defined runs afoul of *Mergens'* rejection of curriculum-relatedness based solely upon "anything remotely related to abstract educational goals," 496 U.S. at 244, 110 S.Ct. 2356, and ignores NHS's community service component altogether. (Reply Memorandum in Support of Plaintiffs' Motion for Partial Preliminary Relief at 13 & n. 9.) Plaintiffs also point to the *Garnett* court's finding that another club "which also combined general academic achievement with community service" was non-curricular. (*Id.* at 14.) *See Garnett,* 772 F.Supp. at 533.[10]

■ The *Mergens* "body of courses as a whole" criterion does little more than restate the Equal Access Act's "curriculum" language using different words.[11] Because of the broad scope of the criterion itself, the subject matter of a student group meeting the "body of courses as a whole" criterion will more likely reflect "some broadly defined educational goal" than a group satisfying the first *Mergens* standard involving relatedness to particular classes. This is borne out by Justice O'Connor's example of a "curriculum related" student government group that "addresses concerns, solicits opinions, and formulates proposals pertaining to the body of courses offered by the school"—a "broadly defined" subject matter, indeed.[12] 496 U.S. at 240, 110 S.Ct. 2356.

What other subject matter may be directly related to the school's "body of courses as a whole?"

Affording students an opportunity to achieve academic excellence in "the body of

---

9. Plaintiffs argue that " '[t]he burden of showing that a group is directly related to the curriculum rests on the school district,' " quoting the Third Circuit's opinion in *Pope.* (Reply Memorandum in Support of Plaintiffs' Motion for Partial Preliminary Relief at 4 n. 2 (quoting *Pope,* 12 F.3d at 1252).) While this may ultimately be so, (*see Mergens,* 496 U.S. at 240, 110 S.Ct. 2356), on a motion for preliminary injunction, the moving party bears the burden of showing a likelihood of success on the merits, *SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1098 (10th Cir.1991), and that burden does not shift.

10. Of course, *Garnett* observed that the "SKY Club's purpose is to help people in need." 772 F.Supp. at 533. Plaintiffs here do not ascribe the same purpose to NHS.

11. "The common meaning of the term 'curriculum' is *'the whole body of courses* offered by an educational institution or one of its branches.' Webster's Third New International Dictionary 557 (1976) ...." *Mergens,* 496 U.S. at 237, 110 S.Ct. 2356 (emphasis added). In the process of interpreting a statute, "Interpretation typically means that one set of words takes the place of another." George Fletcher, *Basic Concepts of Legal Thought, supra* n. 3, at 66.

12. Indeed, in *Pope,* the Third Circuit was reluctant to extend the application of this criterion beyond Justice O'Connor's student government example. 12 F.3d at 1252.

courses as a whole" represents a public secondary school's core purpose. Under the Equal Access Act, schools remain free to encourage academic excellence. Schools likewise remain free to recognize and reward academic excellence whenever it is achieved. No one has suggested that by promoting academic excellence, a school opens its doors to advocacy of non-curricular subject matter.

Allowing a student group to organize and meet on school premises for that same purpose serves to reinforce the school's policies promoting academic achievement. Moreover, insofar as a school has undertaken through its curriculum to prepare students to pursue a college education, a student group that conducts activities designed to assist students in preparing for college directly relates to the school's college preparatory curriculum.

Returning to the logic of the Equal Access Act, a student group that "concerns the body of courses as a whole" must "at least have a more direct relationship to the curriculum than a religious or political club would have," 496 U.S. at 238, 110 S.Ct. 2356, and plainly the National Honor Society has that more direct relationship.

As plaintiffs acknowledge, the subject matter of NHS embraces "recognition of general academic achievement." (Memorandum in Support of Plaintiffs' Motion for Partial Preliminary Relief at 35.) NHS's "Winter social" involves "alumni students who have gone on to college giv[ing] advice to current members of the group." (Id.) Similarly, NHS fund-raising activities involve "collecting money for college scholarships." (Id.)

Activities promoting academic excellence have a far more direct relationship to the school's "body of courses as a whole" than does a student government group that in some undefined way "addresses concerns, solicits opinions, and formulates proposals" pertaining to the curriculum. Academic excellence has no meaning apart from the courses of study offered by a school and cannot be achieved outside of the school's curriculum. By definition, then, academic achievement can have no "noncurriculum related" subject matter.

NHS rewards academic achievement as reflected by its members' entire scholastic performance, reinforcing a core purpose of the school curriculum as a whole. NHS activities also extend the school's college preparatory curriculum by helping to pave the students' road from a high school classroom to a college education.

Rewarding academic excellence through membership in an honor society does not differ in substance from rewarding academic excellence by maintaining an honor roll. In neither instance may members of a religious, political or other advocacy group deem themselves unfairly excluded from a school forum in which other views *not* related to the body of courses offered by the school have found a voice. Organizing an honor society simply does not discriminate against the expression of any non-curricular viewpoint on any subject.

And of course, it is that kind of discrimination that the Equal Access Act seeks to remedy. *Mergens,* 496 U.S. at 238, 110 S.Ct. 2356 ("[T]he purpose of granting equal access is to prohibit discrimination between religious or political clubs on the one hand and other noncurriculum-related student groups on the other[.]"); *id.* at 241, 110 S.Ct. 2356 ("Congress clearly sought to prohibit schools from discriminating on the basis of the content of a student group's speech . . . .").

As with FBLA, plaintiffs have failed to carry their burden to show a likelihood of success on the merits of their claim that the presence of the National Honor Society at East High School creates a limited open forum under § 4071(b) of the Equal Access Act.

### Improvement Council at East (ICE)

Plaintiffs' motion also asserts the "noncurricular" nature of a third student group, the Improvement Council at East (ICE), which plaintiffs contend is primarily a community service organization. (Memorandum in Support of Plaintiffs' Motion for Partial Preliminary Relief at 37–38.) However, for the 1998–99 school year, "[t]he Improvement Council at East (ICE) has not been approved as a student group" and will not "meet at East High School as a student group during non-instructional time" until such time as it is approved. (Affidavit of Cynthia L. Seidel

at ¶ 24.) As such, the Improvement Council at East cannot serve as a basis for any finding of a limited open forum under § 4071(b) for purposes of preliminary prospective relief.

## Conclusion

Having failed to show a likelihood of success on the merits of their Equal Access Act claims based upon the groups addressed by their motion, plaintiffs have failed to establish a clear and unequivocal right to preliminary injunctive relief. Therefore, this court need not address the sufficiency of plaintiffs' claim of irreparable injury, or whether that injury outweighs any potential harm to the defendants that would flow from preliminary relief, or whether preliminary relief would somehow be adverse to the public interest.

Whether a "limited open forum" exists at East High School, or has existed in the recent past, still awaits a final determination on the basis of a complete record. Whether plaintiffs are entitled to compensatory damages or injunctive relief is also a matter reserved for another day. All that is now decided is that plaintiffs are not entitled to partial preliminary injunctive relief on the narrow and specific grounds asserted in their present motion.

For the foregoing reasons,

**IT IS ORDERED** that the plaintiffs' Motion for Partial Preliminary Relief is DENIED.